972 So.2d 1121 (2008)
INTERNATIONAL PAPER, INC.
v.
Cynthia BRIDGES, Secretary Department of Revenue, State of Louisiana.
No. 2007-C-1151.
Supreme Court of Louisiana.
January 16, 2008.
*1122 Oreck, Crighton, Adams & Chase, Jesse R. Adams, III, Andre Brian Burvant, New Orleans, Nicole Crighton, Boulder, CO, for applicant.
Rainer, Anding & McLindon, Robert R. Rainer, Baton Rouge, Robert Frederick Mulhearn, Jr., Emily Winfield Toler, Frank Eugene Bruscato, Jr., Donald Michael Bowman, Antonio Charles Ferachi, for respondent.
Christopher J. Dicharry, Linda Sarradet Akchin, Baton Rouge, for amici curiae, Louisiana Chemical Association, Louisiana Mid-Continent Oil and Gas Association, Louisiana Association of Business and Industry, and Louisiana Pulp and Peper Association.
Drew Michael Talbot, Robert R. Rainer, Baton Rouge, for amicus curiae, Morehouse Sales & Use Tax Commission.
TRAYLOR, Justice.
We granted certiorari in this case in order to determine whether the appellate court erred in reversing the decision of the Board of Tax Appeals ("Board"), wherein the Board ordered the, Louisiana Department of Revenue ("DOR") to refund certain sales and use taxes paid by Plaintiff. Plaintiff, a paper manufacturer, formally requested that the DOR refund those sales and use taxes it paid when it purchased chemicals utilized in the manufacture of white paper products. Plaintiff alleged that these three chemicals were necessary for the "further processing" of the white paper products it produced for resale, and as such, Plaintiff maintained that the purchase of these chemicals should be excluded from the sales and use taxes. The DOR declined to refund said taxes, as the DOR argued that these chemicals were not "further processed" into the final paper products; rather, the DOR contended that Plaintiff was the ultimate consumer of those chemicals. Thereafter, Plaintiff petitioned the Board to resolve this dispute, and the Board, after conducting a hearing and taking the matter under advisement, determined that the purchase of these three chemicals was excluded from the sales and use tax provisions. The Board ordered that the DOR issue a refund to Plaintiff; the district court upheld the Board's decision; however, the appellate court reversed the Board, finding that the Board had erred in both its legal and factual analyses. For the reasons that follow, we reverse the decision of the appellate court, and we reinstate the decision of the Board.

FACTS AND PROCEDURAL HISTORY
The case presently before us involves a paper manufacturing plant operated by International Paper Company ("IP"), at which facility IP manufactures white paper products, including lightweight grades of Bleached paper. These white paper products are manufactured for, and sold to, IP's customers; therefore, IP manufactures its paper products such that they meet certain standards of bond strength, *1123 shelf-life, and color quality, depending upon the specific type of paper product produced.
In order to manufacture the paper, raw timber and wood chips are converted into wood pulp; in turn, the wood pulp is converted into white paper products. However, the conversion of the wood pulp into the final paper products involves a series of complex chemical and physical reactions, and thus, the principles, and physics of organic chemistry play a key role in this conversion process. While we will not dissect the details of the organic chemistry involved in these various reactions, we do recognize the basic "paper making process" as follows: (1) raw timber/wood chips[1] are converted into wood pulp through a "cooking" process in which a great portion of the lignin is removed/dissolved, while a majority of the cellulose materials remain; (2) a small percentage of lignin remains in the wood pulp; and it is the lignin that gives the pulp a brown/ tan color;[2] (3) chemicals are utilized to "decolorize" the lignin, thereby removing the color from the pulp; and (4) the bleached pulp is returned to paper machines for "pressing" into the white paper products.
IP utilized three different chemicals during the decolorization segment of the aforementioned process (i.e., the bleaching process), and the three chemicals used were (1) sodium chlorate, (2) hydrogen peroxide, and (3) elemental oxygen (referred to collectively as the "raw materials"). These raw materials were specifically chosen for the bleaching process because they serve as oxidizing agents for the remaining lignin, and thus, the oxidation of the lignin "lightens" the color of the wood pulp.[3] In simplistic terms, the wood pulp is bleached when oxygen atoms, derived from the raw materials, "break away" from the original chemical compounds; recombine with the lignin molecules; and produce "oxidized lignin," which substance then reflects all of the visible light spectrum, thereby giving the pulp a white color. Furthermore, these raw materials tend to dissolve additional lignin molecules during the bleaching process, and thus, more of the color-producing materials, or chromophores[4] (i.e., the lignin molecules), are removed.
When IP purchased these raw materials, IP paid sales and use taxes in accordance with the provisions of LA.REV.STAT. § 47.302.[5] However, in the early part of 1997, IP requested a legal opinion from the Revenue Tax Analyst of the DOR with regard to the taxability of these chemicals. IP suggested that the raw materials were *1124 purchased for further processing of the paper products; that components (i.e., the oxygen) of the raw materials were incorporated within, and beneficial to, the final paper products; and as such, that the raw materials should be treated as products for resale and excluded from Louisiana's sales and use tax.
Through a letter dated October 31, 1997, the DOR responded to IP's request for legal clarification vis-a-vis the taxability of these raw materials. The DOR pointed out that it had reviewed this very issue in the 1970's, and as a result of its review, a contract was entered into between the DOR and a majority of paper manufacturers in the 1980's (including IP). The agreement basically stated that the chemicals used in the manufacture of white paper products were taxable, as the chemicals were primarily used for the bleaching/whitening of the pulp, as opposed to the chemicals' incorporation within the final paper products. The DOR suggested that the "primary intended purpose" of the chemicals governed their taxability.[6]
In mid-December 1997, IP's Sales and Use Tax Manager sent a refund request to the director of the Sales Tax Division of the DOR. In this request letter, IP asked that the DOR refund $859,846.57, plus interest, which amount represented the sales and use taxes IP paid from January 1, 1995, through March 31, 1997, for the purchase of sodium chlorate, hydrogen peroxide, and elemental oxygen. Again, IP asserted that the three chemicals became incorporated within, and served as beneficial components of, the resulting paper products; therefore, IP argued that no sales and use taxes were due for the purchase of these raw materials. The DOR denied IP's request, and accordingly, IP petitioned the Board of. Tax Appeals to settle this dispute.
On .June 10, 2003, a hearing was conducted by the Board, and thereafter, the Board took this matter under advisement. On October 28, 2003, the Board issued its Written Reasons for Judgment, wherein the Board stated, in pertinent part:
The Issue of IP's Purchasing Chemical for Further Processing. IP has a manufacturing facility in Bastrop, Louisiana. At that facility IP manufactures light-weight grades of paper for sale to its customers. In the process of making this paper IP converts raw timber into finished paper products. IP converts raw and wood chips into pulp. The raw wood is composed of fiber. The fiber is composed of a number of elements including polymers, lignin, cellulose and hemicellulose. The lignin holds the cells together. The wood is initially processed into brown pulp using the Kraft process. After the Kraft process, the lignin remaining in the pulp causes it to be brown which is unsuitable for the grades of paper that IP produces at the Bastrop facility. To remove the brown color from the pulp, IP uses a process designed to bleach the brown color from the residual lignin in the pulp. The bleaching process is called "short sequence bleaching". It is the chemical reactions in the bleaching process that are the issue before the Board.
The chemicals at issue are sodium chlorate, hydrogen peroxide and elemental *1125 oxygen (the Raw Materials). The sodium chlorate is used to generate chlorine dioxide, which together with the hydrogen peroxide and the elemental oxygen are used in the bleaching process. Along with the chemical changes that are brought about by the oxidizing agents, oxygen atoms are bonded to the pulp, especially to the lignin. The incorporation of the oxygen atoms into the molecular structure of the pulp during the bleaching process improves the quality of the pulp and lightens its color to make it suitable for the manufacture of the type of paper that IP seeks to produce.
The question at issue is whether the Raw Materials purchased by IP to oxidize the pulp are "purchases for further processing" and therefore excluded from the sales and use tax. LSA-R.S. 47:301(10)(c)(i) states: "The term `sale at retail' shall not include sales of materials for further processing into articles of tangible personal property for sale at retail . . ." The Secretary's regulation, LAC 61:I.4301(10) and the case law provides that in order to be "material for further processing," as contemplated by the above statute, the raw materials or their component molecular parts must meet three criteria: (1) they must be of benefit to the end product; (2) they must be a recognizable and identifiable component of the end product, and (3) they must have been purchased for the purpose of reprocessing into the end product.
Here the question is whether the Raw Materials meet the three requirements stated above. Both parties produced experts on the bleaching process who testified at the hearing before the Board. The experts were in agreement on many things. During the initial "cooking" phase, the Kraft Process, much of the lignin is removed from the raw pulp, but there remains approximately 3.5% to 4.5% lignin in the pulp at that stage, depending on whether the pulp was made from soft wood or hard wood. The problem with the lignin is that it gives a brown color to the pulp which is not satisfactory for the high quality white paper that IP seeks to produce. The bleaching process is to turn the brown pulp white. It also makes the pulp stronger. This is done by the "short sequence bleaching process" that oxidizes the lignin in the brown pulp. To turn the brown pulp white, two things are done to the lignin. One is to remove chromophores that give the lignin the brown color and the other is to bleach the chromophores in the lignin white. All of the lignin can not be removed because if it was then the cellulose would be damaged and the paper would not be usable. IP's expert testified that IP would like to keep as much lignin in the pulp as possible and still get the desired properties because that would yield more paper. The bleaching process, in essence, bleaches lignon [sic] The end product is oxidized lignon [sic]. After the bleaching process the remaining lignon [sic] is approximately I% to 1.5% of the pulp. The bleaching process removes 50% to 75% of the lignon [sic] from the pulp.
Both of the experts that testified agreed that the pulp acquired additional oxygen in the process but disagreed on the source of the oxygen. The expert for IP testified that the source of the oxygen definitely was from the Raw Materials at issue. He also admitted that some of the oxygen in the bleached pulp came from water used in the process. IP's expert referred to chemical equations that showed that the oxygen from the Raw Materials ended up in the bleached pulp and referred to the writing of other experts in the same field who had performed experiments that proved the *1126 same. The expert for the Secretary testified that the source of the oxygen could have been the Raw Materials but that it could also have been the water that is used in the bleaching process. The bottom line is that both experts testified that oxygen from the Raw Materials ended up in the bleached pulp but the expert for IP testified that he knew that fact to a certainty and the expert for the state testified that some of (the] oxygen from of [sic] the Raw Materials ended up in the bleached pulp but the source of the oxygen was just a matter of chance.
The evidence presented to the Board leads it to the following conclusions. The Raw Materials purchased by IP were purchased to be used in the bleaching process. Oxygen is the primary ingredient used in the bleaching process and the Raw Materials were a primary source of that oxygen. A significant amount of the oxygen from the Raw Materials ended up in the bleached pulp and are recognizable and identifiable. The oxygen from the Raw Materials is beneficial to the bleached pulp and those benefits are by design.
The Secretary argues that the Raw Materials were not purchased primarily to be a source of oxygen in the bleached pulp. Even if the state is correct, the evidence reveals that the oxygen from the Raw Materials is a significant amount of the oxygen remaining in the bleached pulp.
It is the ruling of the Board that under the circumstances of this particular case, considering that it is the intention of IP to oxidize the raw pulp and acquire the Raw Materials for the purpose of getting a source of oxygen, the fact that some, of the oxygen in the finished product may come from water does not mean that the Raw Materials are not for further processing as contemplated by the above statute. Therefore, it is the ruling of the Board that the sodium chlorate, hydrogen peroxide and elemental oxygen are purchased for further processing.[7]
On May 6, 2004, the Board signed its Judgment, ordering that the DOR issue IP a refund in the amount of $738,908.81, plus interest. As a result of this judgment, the DOR petitioned the Fourth Judicial District Court for judicial review of the Board's decision.[8]
On August 7, 2006, after conducting a hearing regarding the Board's decision, the district court took the matter under advisement. On September 7, 2006, the district court issued its written Reasons for Judgment, wherein the court found that the Board was not manifestly erroneous in its factual, determinations. Thus, the district court affirmed the Board's decision, and the judgment was signed on September 20, 2006. In light of the district court's ruling, the DOR filed its appeal with the Second Circuit Court of Appeal on October 2, 2006.
*1127 On April 4, 2007, the appellate court reversed the Board's decision, and rendered judgment in favor of the DOR. The Second Circuit stated, in pertinent part:
In order for the reprocessing exception to apply, four requirements must be met: (1) the material itself must be processed into tangible personal property for sale at retail, (2) the material must become a recognizable, integral part of the end product, (3) the presence of the material as a component of the end product must be of benefit to the end product, (4) the primary purpose for the purchase of the material must be to process it into the end product. The source of these elements include the jurisprudence and the Louisiana Administrative Code. . . .
. . . .
The "primary purpose" test appears to be of jurisprudential origin. The leading cases on this element of the analysis are Traigle v. PPG Industries, Inc., 332 So.2d 777 (La.1976), and Vulcan Foundry, Inc. v. McNamara, 414 So.2d 1193 (La.1982).
. . . .
We conclude that the "purpose" for which IF bought the three chemicals in this case is not for incorporation "into" the pulp mixture product but rather to be used in the process of producing the white paper product for sale. That is to say, to process the pulp mixture by removing most of the lignin remaining after the Kraft process, and processing what lignin remains thereafter by oxidation. Although the chemical reactions in the process involve adding oxygen atoms whose origin can be traced to the chemicals or processes in question, the purpose of the chemicals is to process the lignin in the pulp for paper, not to incorporate raw materials (the chemicals) into the paper product. Therefore, IP's purchase of the chemicals is as a "consumer" for a "purpose other than for resale" for the purpose of removing and modifying lignin already in the wood, and not for further processing the chemicals themselves into an article of tangible property for sale at retail.[9]
Thus, the appellate court ruled in, favor of the DOR, and determined that the raw materials were subject to the sales and use tax provisions. After the appellate court denied rehearing on May 3, 2007, IP filed a writ application with this Court. On September 21, 2007, this Court granted IP's application for review.[10]

LAW AND DISCUSSION
A. Standard of Review
With regard to the appropriate standard of review for those decisions issued by the Board, LA.REV.STAT. § 47:1435 is instructive, as that statute provides that reviewing courts may reverse or modify decisions of the Board if those decisions are not in accordance with law. Further, this Court in St. Pierre's Fabrication and Welding, Inc. v. McNamara, 495, So.2d 1295 (La.1986) stated:
The standard of review of a decision of the Board of Tax Appeals is correctly enunciated in Collector of Revenue v. Murphy Oil Co., 351 So.2d 1234 (La. App. 4th Cir.1977). Judicial review of a decision of the Board is rendered upon the record as made up before the Board and is limited to facts on the record and questions of law. The Board's findings of fact should be accepted where there is substantial evidence in the record to support them and should not be set *1128 aside unless they are manifestly erroneous in view of the evidence on the entire record.[11]
As the Murphy Oil Co. court annunciated:
In this type of case, the Board acts as a trial court, its findings of fact should be accepted where there is substantial evidence in the record to support them, and should not be set aside unless they are manifestly erroneous in view of the reliable, probative and substantial evidence on the whole record. If the Board has correctly applied the law and adhered to correct procedural standards, its judgment should be affirmed.[12]
In the case currently before us, the appellate court determined that the Board erred as a matter of fact and as a matter of law; therefore, we must first turn our attention to the applicable law.
B. Applicable Legislation and Administrative Rules
As mentioned in an earlier footnote, LA. REV.STAT. § 47:302 is the statutory provision which outlines the imposition of sales and use taxes. Specifically, LA.REV.STAT. § 47:302(A) provides, in pertinent part:
There is hereby levied a tax upon the sale at retail, the use, the consumption, the distribution, and the storage for use or consumption in this state, of each item or article of tangible personal property, as defined herein. . . .
"Sale at retail" can take on different meanings, depending upon the taxing authority involved and/or the product(s) being sold. LA.REV.STAT. § 47:301(10)(a)(i) provides, in pertinent part:
Solely for the purposes of the imposition of the state sales and use tax, "retail sale" or "sale at retail" means a sale to a consumer or to any other person for any purpose other than for resale as tangible personal property. . . . (Emphasis added).
Furthermore, LA.REV.STAT. § 47:301(10)(c)(i)(aa) (i.e., the "further processing exclusion") provides:

The term "sale at retail" does not include sale of materials for further processing into articles of tangible personal property for sale at retail. (Emphasis added).
It is the conflicting interpretations of this "further processing exclusion" that has resulted in the instant litigationi.e., IP contends that its raw materials are further processed into its white paper products, while the DOR contends that the raw materials are merely used during the manufacturing process and not incorporated within the final paper products.
While the issue of the proper interpretation of the "further processing exclusion" is not res nova, the Legislature has not yet delineated what, exactly, is meant by "materials for further processing into articles of tangible personal property."[13] However, *1129 there is a DOR rule which specifically addresses the "further processing exclusion," and which may be found in the Louisiana Administrative Code. LA. ADMIN. CODE, Title 61, Part I, § 4301, Retail Sale or Sale at Retail (d) (2006)("LAC 61:I.4301"), provides:
Sales of materials for further processing into articles of tangible personal property for subsequent sale at retail do not constitute retail sales. This exemption does not cover materials which are used in any process by which tangible personal property is produced, but only those materials which themselves are further processed into tangible personal property. Whether materials are further processed or simply used in the processing activity will depend entirely upon an analysis of the end product. Although any particular materials may be or used, consumed, absorbed, dissipated or otherwise completely disappear during processing, if it does not become a recognizable and identifiable component which is of some benefit to the end product, it is not exempt under this provision. The fact that a material remained as a recognizable component of an end product by accident because the cost of removal from the end product was prohibitive or for any other reason, if it does not benefit the property by its presence, it was not material for further processing and the sale is not exempt under this provision. (Emphasis added).
It is from the aforementioned rule that a "three-pronged test" developed, in order to determine the taxability of those materials purchased for further processing. As the Board noted in its decision:

The Secretary's regulation, LAC 61:I.4301(10) and the case law provides that in order to be "material for further processing," as contemplated by the above statute, the raw materials or their component molecular parts must meet three criteria: (1) they must be of benefit to the end product; (2) they must be a recognizable and identifiable component of the end product, and (3) they must have been purchased for the purpose of reprocessing into the end product.[14]
Thus, we must now turn our attention to the prior case law that interpreted the "further processing exclusion" in terms of the DOR's own administrative rule.
C. Prior Jurisprudential Analyses
In Traigle v. PPG Industries, Inc., 332 So.2d 777 (La.1976), this Court examined whether the purchase of graphite blades, utilized in the manufacture of chlorine, was excluded from the sales and use tax provisions. The manufacturer contended that the graphite blades were incorporated within the final product (i.e., the graphite was purchased for its eventual resale within *1130 in the chlorine, and therefore, excluded from the sales and use tax), while the Collector of Revenue asserted that the manufacturer purchased the graphite as part of its manufacturing process (i.e., the manufacturer was the ultimate consumer of the graphite). The Traigle Court concluded:
The Louisiana sales/use tax is a tax upon the sale at retail, use, consumption, distribution, or storage for use in consumption, of materials sold or used in Louisiana. La.R.S. 47:302(A). It is measured by the sales price if the item is sold at retail, or upon the cost price when not sold at retail but rather used, consumed, or stored for use or consumption. La. R.S. 47:302(A).
Pertinently to the present issue, La.R.S. 47:301(10) defines "sale at retail" as: "* * * A sale to a consumer or to any other person for any purpose other than for resale in the form of tangible personal property. . . . The term `sale at retail' does not include sales of materials for further processing into articles of tangible personal property for sale at retail * * *."
We should here note that, in the light of this precise definition and of the general purpose of the tax statute to impose the sales/use tax upon the transaction by which the ultimate consumer receives the particular item, the more reasonable interpretation in this instance is that the taxpayer manufacturer is liable for tax upon the graphite anodes: They were not purchased by the taxpayer for the "purpose" of "resale in the form of tangible personal property", but rather for the purpose of using them as a part of the manufacturing process (like the machinery or fuel) in order to produce the chlorine for purposes of resale of the chlorine to an ultimate consumer.
Taxpayer's. Contention
The taxpayer points out, however, that traces of the carbon (but about 60% of the original anodes) are found in the bulk containers which contain the final chlorine product. Thus, they view the carbon as purchased for further processing "into" the chlorine manufactured for sale at retail.
Therefore, relying upon the principle that tax statutes should be liberally construed in favor of the taxpayer, the defendant argues that we should adhere to the interpretation by the majority of the court of appeal, namely: Since the carbon (although consumed) is in residue partly included within the final product's bulk, it was purchased for "further processing into" the chlorine, which (in combination with the carbon oxide residues) was the product produced for sale at retail.
The taxpayer's contention is tenable. The literal wording of the definition in the last sentence of La.R.S. 47:301(10) (quoted in full, footnote 3), upon which the taxpayer relies, permits this interpretation-namely that, if the substance used in the manufacture enters into the final article produced for resale (however unintended or useless or minutely), the substance can be regarded as purchased for "processing into" the article produced for sale; and thus as taxable, not to the manufacturer who used the substance, but to the purchaser at retail as the ultimate consumer.
Conclusion
Nevertheless, viewing the definition of La.R.S. 47:301(10) as a whole, the better or more reasonable interpretation, we believe, is that the substance cannot be regarded as purchased for processing "into" the finished article (and, thus, as non-taxable to the manufacturer), *1131 when in fact the "purpose" for which it is bought is not for incorporation "into" the manufactured product but rather only to be used in the process of producing the manufactured product for sale-at least where, as here, the inclusion of the waste residue of the substance results from an unintended (although unavoidable) inefficiency of the manufacturing process, is of no benefit to the product sold, and is of the nature of an impurity rather than of an integral part of the finished product.[15]
Accordingly, the Traigle Court recognized that the "further processing exclusion" applied to those raw materials purposefully incorporated within the final products (i.e., not incidentally/accidentally incorporated within the final products), such that said incorporation resulted in the raw materials providing integral and beneficial parts to the final products produced. In reaching its conclusion that the graphite was subject to the sales and use tax, the Traigle Court examined the applicable statutory provisions, and in so doing, the Court looked to the DOR's own administrative rule for guidance.[16] As such, the Court stated:
Arid, if we were in doubt and regarded the statutory definition as ambiguous (we do not), we would find of persuasive aid the administrative construction given to the statute since soon (1949) after its enactment in present form in 1948 and all during the taxable years (1968-1972) in question. By this contemporaneous construction through the years, as is essentially uncontested, the graphite used in the manufacturing process was not regarded as non-taxable to the manufacturer, nor as purchased for incorporation into the finished product, for the reason that the small carbon residue found in the ultimate product was not "a recognizable, integral part" of it.4
4 Article 2-37 (as numbered in the 1961 edition) of the rules and regulations of the department of revenue for administration of the Louisiana General Sales Tax provided: "Sales to manufacturers and producers. The gross receipts of gross proceeds derived from sales of raw materials to manufacturers to be used in fabricating or producing finished articles of tangible personal property for resale and which becomes a recognizable, integral part of such finished articles, are not subject to the tax imposed under the sales tax act. The proceeds derived from subsequent sales of such finished articles of tangible personal property to consumers or users are subject to the tax."
By a 1973 amendment, after the taxable period, the department added a further clarification that the included substance must be of some benefit to the final product. While we agree with the taxpayer that this later administrative construction cannot be given weight as an additional' requirement, we also agree with the trial court that the 1973-added explanation of beneficial effect was reasonably implied by the earlier requirement that, to be non-taxable, the substance must be an integral part of the finished article.[17]
Furthermore, with regard to the "weight" of administrative rules, the Court observed:
As the taxpayer notes, an administrative construction cannot have weight where it is contrary to or inconsistent with the statute. However, where the statute is ambiguous (as, most favorably to the taxpayer, this statutory definition *1132 may be), a long settled contemporaneous construction by those charged with administering the statute is given substantial and often decisive weight in its interpretation.

This is especially so where, as here, the administrative construction has consistently been followed since adoption of the statute over twenty years ago. In the absence of legislative amendment during that long period, the administrative construction may reasonably be presumed to be in accord with the legislative intent; it also being a reasonable meaning of the legislative language in the light of the legislative purpose evidenced by the statute as a whole.[18]
Thus, the Traigle Court recognized the significance of the DOR's administrative rule with regard to the proper interpretation of the "further processing exclusion."
Several years after the, Traigle decision, this Court was again faced with a question involving the taxability of raw materials utilized in the "further processing" of final products for resale. In Vulcan Foundry, Inc. v. McNamara, 414 So.2d 1193 (La. 1982), the manufacturer was producing manhole covers, drain gates, and other "municipal castings," and as such, these final products had to be made out of a specific grade of iron. In order to obtain the proper grade of iron for its final products, the manufacturer placed alternating layers of scrap iron and coke into a cylindrical structure (i.e., a cupola) for heating. The molten iron would then be drained from the bottom of the cupola and poured into the casting molds.
The manufacturer contended that the coke was excluded from sales and use taxes, as the manufacturer suggested that the cokea raw material primarily composed of carbonwas a key, and beneficial, Component of the final products produced. The Vulcan Court stated:
We previously considered the reprocessing exclusion in Traigle v. PPG. Industries, Inc., 332 So.2d 777 (La.1976). That case involved the manufacture of chlorine. Graphite blades were used to make anodes so that electricity could pass through salt water brine in such a way as to break down the brine into its component parts. During this process, the graphite blades were consumed, but about sixty percent of the original anodes were present in the finished product. We held that the graphite blades were taxable to the manufacturer because they were not purchased for further processing into the chlorine. The test we set out for determining whether an item is subject to sales/use tax is the "purpose" for which it was purchased.

The court of appeal distinguished the instant case from PPG because, in PPG, the residue found in the final product was useless waste material and of the nature of an impurity. Here, the presence of carbon in the final product is beneficial to Vulcan. The proper inquiry, however, is the purpose for which the coke is bought.

. . . .
Dr. Tabony [a mechanical engineer and metallurgist] further testified that coke is used because it burns easily and has less volatile gases. Mr. Morgan, vice president and general manager of Vulcan, testified that natural gas or electrical induction furnaces could be used but that coke is a very' efficient fuel. He stated that the addition of carbon was a secondary benefit. Moreover, there was evidence that carbon could be added to the molten iron in the form of carbon brickettes.

*1133 It is clear from the evidence in this case that coke is purchased for, the purpose of heating the scrap iron; the small amount of carbon in the finished product is incidental. The fact that using coke as a fuel has a beneficial side effect does not change the purpose for which it is bought. Accordingly, we conclude that Vulcan's purchase of coke is as a "consumer" for a "purpose other than for resale," that is, for its use as a heat source to melt scrap iron and not for further processing into an article of tangible property for sale at retail.[19]
While recognizing that the carbon (from the coke) became an identifiable and beneficial component of the final products, the Vulcan Court focused upon the "purpose" for which the manufacturer purchased the raw material. As such, this Court concluded that the coke was subject to sales and use taxes because the, presence of the carbon in the final products was merely incidental to the manufacturing process.
D. Appropriate Test for the "Further Processing Exclusion"
Given the facts of the matter currently before us, we must now determine whether the Board correctly utilized the applicable laws and/or procedures in reaching its decision, or whether the appellate court correctly set forth the legal analysis to be used when answering questions involving the. "further processing exclusion." IP contends that the appellate court erred by creating a "new test" for determining which materials are to be excluded from the sales and use tax, in derogation of the "further processing exclusion" as provided by LA.REV.STAT. § 47:301(10)(c)(i)(aa). As mentioned earlier in our opinion, the Second Circuit found:
In order for the reprocessing exception to apply, four requirements must be Met: (1) the material itself must be processed into tangible personal property for sale at retail, (2) the material must become a recognizable, integral part of the end product, (3) the presence of the material as a component of the end product must be of benefit to the end product, (4) the primary purpose for the purchase of the material must be to process it into the end product.[20]
We find that the appellate court correctly determined that the "further processing exclusion" applies to those raw materials becoming recognizable and integral parts of the end products, while at the same time, the raw materials subject to the tax exclusion must be beneficial to the end products. However, our review of the applicable law and jurisprudence does not suggest that the raw materials themselves (i.e., the exact chemical/physical compositions of the raw materials) must appear in the end products, nor does the law suggest that the primary purpose for the purchase of these raw materials must be their incorporation into the end products.
As we previously discussed, the "further processing exclusion," which merely provides that "[t]he term "sale at retail" does not include sale of materials for further processing into articles of tangible personal property for sale at retail,"[21] has been further explained by the DOR's own administrative rule (i.e., LAC 61:I.4301).[22] From this rule, we recognize *1134 that raw materials "further processed" into end products are excluded from the sales and use tax provisions when: (1) the raw materials become recognizable and identifiable components of the end products; (2) the raw materials are beneficial to the end products; and (3) the raw materials are material for further processing, and as such, are purchased with the purpose of inclusion in the end products.
In the case at hand, the appellate court determined:
. . . . we conclude that IP purchases the three chemicals in question as a consumer for a purpose other than for resale. We disagree with the Board's finding that IP's process meets the first requirement that the material itself must be processed into tangible personal property for sale at retail. The materials in this case involve only partial elements of the original materials, namely oxygen atoms, and in such minute amounts that they were not purchased for the purpose of resale in the form of tangible property or further processing into the final product. PPG Industries, supra; LAC 61:I.4301.[23]
It would be illogical to assume that raw materials would be excluded from sales and use taxes if those raw materials themselves were not used for incorporation into the final products; however, as we have already determined, nothing in the legislation, administrative rule, and/or jurisprudence mandates that the chemical/physical composition(s) of raw materials incorporated into end products remain the same after their incorporation into the final products. We acknowledged this notion in Vulcan Foundry, Inc. v. McNamara, 414 So.2d 1193 (La.1982), as in that case, we were dealing with the incorporation of carbon into the final products (i.e., the iron castings), yet the carbon was derived from, the raw material, i.e., coke. The Vulcan Court noted:
Here, the presence of carbon in the final product is beneficial to Vulcan. The proper inquiry, however, is the purpose for which the coke is bought. *1135 Vulcan argues that the purpose of using coke is to process carbon into the iron for sale at retail. It points out that ACTM Class 30 gray iron must contain between 3.10 and 3.30 percent carbon. Since the scrap iron does not always contain sufficient carbon, and the melting process results in a loss of carbon, carbon must be added to the iron in some way. One method is to use coke as a heat source because it gives off carbon as it burns. The required carbon content is achieved by varying the ratio of coke to scrap iron in the cupola.[24]
While the Vulcan Court ultimately determined that the coke had been purchased for heating purposes, rather than the purpose of incorporation into the final products, the Vulcan Court still acknowledged that the incorporation of derivatives of those raw materials purchased could potentially give rise to the raw materials" exclusion from sales and use tax provisions.
To be excluded from the sales and use tax provisions, we also agree that the raw materials must be purchased with the purpose of incorporating said materials into the end products (i.e., the raw materials are "material for further processing"[25] ); however, in the instant case, the appellate court found that, to be excluded from taxes, the raw materials must have been purchased for the primary purpose of incorporation into the end products. The appellate court stated:
The "primary purpose" test appears to be of jurisprudential origin. The leading cases on this element of the analysis are Traigle v. PPG Industries, Inc., 332 So.2d 777 (La.1976), and Vulcan Foundry, Inc. v. McNamara, 414 So.2d 1193 (La.1982).[26]
The appellate court appears to have expanded upon our holdings in the aforementioned cases, as neither the Traigle Court, nor the Vulcan Court, suggested that a "primary purpose" test was required. Rather, both the Traigle and Vulcan Courts recognized the necessity of a "purpose" test. In fact, the Vulcan Court noted:
We previously considered the reprocessing exclusion in Traigle v. P.P.G. Industries, Inc., 332 So.2d 777 (La.1976). [In Traigle we] herd that the graphite blades were taxable to the manufacturer because they were not purchased for further processing into the chlorine. The test we set out for determining whether an item is subject to sales/use tax is the "purpose" for which it was purchased.[27]
Accordingly, to be excluded from sales and use tax, we find that the raw materials must have been purchased for the purpose of incorporation within the end products, as the raw materials must be material for the further processing of the final products produced.
E. Was the Board's Decision Manifestly Erroneous
Because we find that the Board utilized the appropriate laws and procedures in reaching its decision, we must now determine if the Board was manifestly erroneous in reaching its conclusion that IP's purchase of the sodium chlorate, hydrogen peroxide, and elemental oxygen for *1136 the further processing of its white paper products should be excluded from the sales and use tax provisions. A careful review of the record before this Court demonstrates that there is substantial evidence to support the factual determinations of the Board, and thus, we conclude that the Board was not manifestly erroneous in reaching its decision.
We find that the Board aptly summarized the "key" evidence/testimony in its Written Reasons for Judgment:
Both of the experts that testified agreed that the pulp acquired additional oxygen in the process but disagreed on the source of the oxygen. The expert for IP testified that the source of the oxygen definitely was from the Raw Materials at issue. He also admitted that some of the oxygen in the bleached pulp came from water used in the process. IP's expert referred to chemical equations that showed that the oxygen from the Raw Materials ended up in the bleached pulp and referred to the writing of other experts in the same field who had performed experiments that proved the same. The expert for the Secretary testified that the source of the oxygen could have been the Raw Materials but that it could also have been the water that is used in the bleaching process. The bottom line is that both experts testified that oxygen from the Raw Materials ended up in the bleached pulp but the expert for IP testified that he knew that fact to a certainty and the expert for the state testified that some of oxygen from of [sic] the Raw Materials ended up in the bleached pulp but the source of the oxygen was just a matter of chance.[28]
Thus, the Board's conclusion that the raw materials became incorporated within the end products is reasonable in light of the evidence adduced at the hearing in this matter, as the evidence suggested that oxygen derived from the raw materials became a recognizable, identifiable; and integral part of the white paper products produced. Moreover, the record contains testimonial evidence suggesting that the presence of the oxygen within the final products was not only beneficial to these products, but necessary for their production. The record also contains testimonial evidence suggesting that IP bought these raw materials specifically to achieve the aforementioned results vis-a-vis the production of its white paper products. As such, the Board's decision must be affirmed.

CONCLUSION
The Board correctly utilized the well-established "three-pronged" test for determining which raw materials, purchased for the further processing of final products for resale, are excluded from the sales and use tax provisions. As such, we acknowledge that raw materials "further processed" into end products are excluded from the sales and use tax provisions when: (1) the raw materials become recognizable and identifiable components of the end products; (2) the raw materials are beneficial to the end products; and (3) the raw materials are material for further processing, and as such, are purchased with the purpose of inclusion in the end products. Because we have determined that the Board's decision should be reinstated, we pretermit a discussion of IP's remaining assignments of error. Accordingly, for the foregoing reasons, the appellate court's decision is reversed, and the Board's decision is reinstated.
*1137 REVERSED; DECISION OF, BOARD REINSTATED.
NOTES
[1] Raw timber and/or wood chips are composed of fibers of cellulose, hemicellulose, and lignin. Cellulose and hemicellulose are the major components of the cell walls of plants, while lignin is the "glue" that holds the cellulose materials together.
[2] A small percentage of lignin must remain in the wood pulp in order for the paper to be usable.
[3] The term "oxidation," as used in the context of this discussion, pertains to the chemical process whereby substances are combined with oxygen.
[4] The Merriam-Webster Online Dictionary defines a "chromophore" as:

a chemical group (as an azo group) that absorbs light at a specific frequency and so imparts color to a molecule; also: a colored chemical compound
MERRIAM-WEBSTER ONLINE DICTIONARY, http:// www.m-w.com/dictionary/chromophore (last visited December 19, 2007).
[5] LA.REV.STAT. § 47:302 provides, in pertinent part:

Imposition of tax
A. There is hereby levied a tax upon the sale at retail, the use, the consumption, the distribution, and the storage for use or consumption in this state, of each item or article of tangible personal property, as defined herein. . . . (Emphasis added).
[6] Over IP's objection, a copy of the purported contract (from 1984) between the DOR and IP was introduced during the hearing before the Board. The Board found that the agreement was irrelevant with regard to the case at hand, as the manufacturing processes currently utilized are materially different from those processes utilized in the mid-1980's. Furthermore, the appellate court noted that the contract was not properly authenticated, and as such, the appellate court concluded that the contract constituted hearsay evidence. Thus, this contract is not a factor in the analysis of the issues presently before us.
[7] Supp. R., Vol. 1 of 2, Board of Tax Appeals' Written Reasons for Judgment (10/28/2003), pp. 1-4 (alteration in original).
[8] LA.REV.STAT. § 47:1435 provides:

The district courts shall have exclusive jurisdiction to review the decisions or judgments of the board, and the judgment of any such court shall be subject to further appeal, suspensive only, in accordance with law. If a suspensive appeal is taken from a judgment of the district court no further bond need be posted and the bond originally posted remains in full force and effect to guarantee the payment of any tax, interest, and penalty until final decision of the court. Upon, such review, such courts shall have the power to affirm or, if the decision or judgment of the board is not in accordance with law, to modify, or to reverse the decision or judgment of the board, with or without remanding the case for further proceedings as justice may require.
[9] International Paper, Inc. v. Bridges, 42,023, pp. 11-21 (La.App. 2 Cir. 4/4/07); 954 So.2d 321, 329-34.
[10] International Paper, Inc. v. Bridges, 07-1151 (La.9/21/07); 964 So.2d 319.
[11] St. Pierre's Fabrication and Welding, Inc. v. McNamara, 495 So.2d 1295, 1298 (La.1986)(emphasis added).
[12] Collector of Revenue v. Murphy Oil Co., 351 So.2d 1234, 1236 (La.App. 4 Cir.1977) (emphasis added).
[13] It is interesting to note that during the Legislature's 2007 Regular Session, a Senate Concurrent Resolution was adopted, which resolution addressed the proper interpretation of the "further processing exclusion." Senate Concurrent. Resolution No. 136 states, in pertinent part:

WHEREAS, many states do not tax any chemicals or other property required for the manufacturing of property for resale; and
WHEREAS, deviations from the three prong test make the taxability of property required for manufacturing in Louisiana uncertain and undermine the efforts of Louisiana to attract additional investment dollars to the state. THEREFORE, BE IT RESOLVED that the Legislature of Louisiana does hereby urge and request the secretary of revenue to:
(1) Recognize the interpretation of R.S. 47:301(10)(c) that has been long recognized by Louisiana courts and embrace the three prong test for the non-taxability of further processing materials, to wit: materials are nontaxable materials for further processing if (i) the material or its components become an identifiable component of the product, (ii) the material or its components are beneficial to the end product, and (iii) the presence of the material in the end product is not incidental.
(2) Adopt regulations consistent with such interpretations.
(3) File pleadings consistent with such interpretations in court proceedings concerning the interpretation of R.S. 47:301 (10)(c)(i)(aa).
[14] Supp. R., Vol. 1 of 2, Board of Tax Appeals' Written Reasons for Judgment (10/28/2003), p. 2 (emphasis added).
[15] Traigle v. PPG Industries, Inc., 332 So.2d 777, 780-81 (La.1976) (footnote omitted) (emphasis added).
[16] Although these statutory and administrative provisions have been amended several times since 1976, the amendments, while clarifying the law on certain points, have not changed the substance of the law.
[17] Id. at 781(emphasis added).
[18] Id. at 782 (citations omitted) (emphasis added).
[19] Vulcan Foundry, Inc. v. McNamara, 414 So.2d 1193, 1198-99 (La.1982) (emphasis added) (alteration in original).
[20] International Paper, Inc. v. Bridges, 42,023, p. 11 (La.App. 2 Cir. 4/4/07); 954 So.2d 321, 329 (emphasis added).
[21] LA.REV.STAT. § 47:301(10)(c)(i)(aa).
[22] Although we supplied the text of this rule earlier in our analysis, the specific provisions of LAC 61:I.4301 bear repeating. These provisions detail the appropriate "test" to be employed when there are questions regarding the taxability of raw materials "further processed" into end products:

Sales of materials for further processing into articles of tangible personal property for subsequent sale at retail do not constitute retail sales. This exemption does not cover materials which are used in any process by which tangible personal property is produced, but only those materials which themselves are further processed into tangible personal property. Whether materials are further processed or simply used in the processing activity will depend entirely upon an analysis of the end product. Although any particular materials may be fully used, consumed, absorbed, dissipated or otherwise completely disappear during processing, if it does not become a recognizable and identifiable component which is of some benefit to the end product, it is not exempt under this provision. The fact that a material remained as a recognizable component of an end product by accident because the cost of removal from the end product was prohibitive or for any other reason, if it does not benefit the property by its presence, it was not material for further processing and the sale is not exempt under this provision. (Emphasis added).
Furthermore, it is important to note that the DOR's administrative rules have "the full force and effect of law," as provided by LA. REV. STAT. § 47:1511, which states;
In addition to specific authority granted to the secretary elsewhere, the secretary is authorized to prescribe rules and regulations to carry out the purposes of this Title and the purposes of any other statutes or provisions included under the secretary's authority. These rules and regulations shall be promulgated pursuant to the provisions of the Administrative Procedure Act and will have the full force and effect of law. (Emphasis added).
[23] International Paper, Inc. v. Bridges, 42,023, p. 15 (La.App. 2 Cir. 4/4/07); 954 So.2d 321, 331 (emphasis added).
[24] Vulcan Foundry, Inc. v. McNamara, 414 So.2d 1193, 1198-99 (La.1982).
[25] See LA. ADMIN. CODE, Title 61, Part I, § 4301, Retail Sale or Sale of Retail (d) (2006).
[26] International Paper, Inc. v. Bridges, 42,023, p. 12 (La.App. 2 Cir. 4/4/07); 954 So.2d 321, 329.
[27] Vulcan Foundry, Inc. v. McNamara, 414 So.2d 1193, 1198 (La.1982) (alteration in original) (emphasis added).
[28] Supp. R., Vol. 1 of 2, Board of Tax Appeals' Written Reasons for Judgment (10/28/2003), p. 3 (emphasis added).