WEIMER, J.,
dissenting in part.
_JjAs noted in the majority opinion, this matter came before this court previously following a summary judgment in Bridges v. Nelson Indus. Steam Co., 13-0171 (La.3/8/13), 108 So.3d 1168. In a per cu-riam, the summary judgment in favor of the tax collector was reversed, with a finding that “genuine issues of material fact exist,” Id., as to whether the limestone is “material for further processing, and as such, [is] purchased, with the purpose of inclusion in the end products.” See International Paper, Inc. v. Bridges, 07-1151, p. 19 (La.1/16/08), 972 So.2d 1121, 1133-34. On remand, the lower courts found that Nelson Industrial Steam Company (Nelson) buys | limestone for the purpose of producing steam and electricity and that its production of ash is merely an “incidental, by-product” , of Nelson’s production process, not an intentionally produced end product. See Bridges v. Nelson Indus. Steam Co., 14-1250, p. 18-21 (La.App. 3 Cir. 6/24/15), 169 So.3d 711, 721-23.
As recognized by the majority, sales tax is levied on the “sale at 'retail,” which is defined in La. R.S. 47:301(10)(a).[1] See La. R.S. 47:302(A), Sale at -retail “does not include sale of-materials for further processing into articles of tangible personal property for sale at retail.” La. R.S. 47:301(10)(c)(i)(aa). “[R]aw materials ‘further processed’ into end products are excluded[2] from the sales and use tax provi *296 sions when: (l).the raw materials, become recognizable■ and identifiable components of the end products; (2) the raw materials are beneficial to the end products; and (3) the raw materials are material for further processing, and as such, are purchased with the purpose of inclusion in the end products.” Bridges v. Nelson Indus. Steam Co., 15-1439, Op. at 281 (La.5/3/16), (quoting International Paper, Inc., 07-1151 at 19, 972 So.2d at 1134). The first two prongs are derived from LAC 61:1.4301(0), which the Louisiana Department' of Revenue promulgated to provide guidance on the meaning Of the “further processing” phrase in La. R.S. 47:301(10)(c)(i)(aa).[3] This administrative regulation" clarifies that a raw material “become a recognizable arid identifiable component which is of some benefit to the end product.” LAC 61:1.4301(0, Retail Sale or Sale at Retail (d),(emphasis added).' ’ As recognized by the majority, the third prong of this test (that is at issue iri this case) finds its origin |sin Traigle v. PPG Indus., Inc., 332 So.2d 777, 781 (La.1976), and was reiterated in Vulcan Foundry, Inc. v. McNamara, 414 So.2d 1193, 1198-99 (La.1982) (on reh’g);[4]
Nelson is principally in the business of producing electricity and steam, but also produces and sells ash. It purchased limestone for the primary purpose of reducing the- sulfur emissions that resulted from its choice of fuel (petcoke) for the boilers used in its fuel’producing process, so as to comply with federal and state regulations. Clearly, limestone was not purchased for the purpose of being incorporated .into the end products — electricity. and ■ steam. However, since La. R.S. 47:301(10)(e)(i)(aa) and the test advanced by International Paper are not limited to a primary purpose [5] or a single purpose,[6] it is conceivable that Nelson’s purchase -of limestone served a dual purpose, one of which satisfied the requirements of the further processing exclusion. The limestone (absent the calcium carbonate from the limestone that interacted with the sulfur emitted from the petcoke and was consumed diming the fuel production process) ultimately formed part of the ash — Nelson’s third end product in this case. Significantly and importantly for this analysis, the evidence submitted below established that the ash has several commercial applications and is sold to third parties unrelated to Nelson in legitimate arm’s-length transactions. The gross tonnage of the limestone used approximately equaled the gross tonnage of the ash produced. As' a result of the limestone’s interaction with the sulfur emitted during | ¿Nelson's fuel production; ash is produced, even if incidentally." In this context, some portion of the lirnestone is further processed as required by La. R.S. 47:301(10)(c)(i)(aa).
Nelson’s decision to use petcoke, instead of natural gas, as a fuel source in its fuel production process was made with full awareness that Nelson would become a producer of ash. Upon making'this decision, Nelson made revisions to its facilities to accommodate the ash' that would be produced as a result of its conversion to a more economical circulation fluidized boil *297 ers technology. Therefore, the inescapable conclusion is that the limestone was purchased for the purpose of inclusion in the ash. This satisfies the requirement of the third prong of the further processing test advanced by International Paper. Without the limestone, there would be no ash. Although the production of ash was not Nelson’s primary purpose for purchasing the limestone, I believe, given the record in. this case, that the limestpne was undoubtedly “purchased [by Nelson] with the purpose of inclusion in the end products” — the ash, as required by International Paper, 07-1151 at 23, 972 So.2d at 1136. Accordingly, the further processing exclusion of La. R.S. 47:301(10)(c)(i)(aa) applies in this case.
However, the difference in the costs of the limestone and sales price of the ash reveals that most of the limestone’s value lies in its calcium carbonate, which is consumed in Nelson’s fuel production process to inhibit sulfur emissions and is, thus, not included in the ash.[7] For this reason, I disagree with the majority’s approach as I do not believe under the facts of this case that the entire cost of the limestone should Lbe excluded from sales tax under the guise of the further processing exclusion. I believe, like Justice Marcus in Traigle v. PPG Industries, Inc., 332 So.2d 777, 783 (La.1976) (Marcus, J., dissenting in part), that the better approach in a case such as this, where all of the limestone (after removal of the calcium carbonate during Nelson’s fuel production process) goes into the production of an undeniably marketable product, although incidentally, would be to allocate the costs of the limestone based on its use.[8] .Accordingly, I believe that sales tax. is owed on that portion of the limestone that is not incorporated into the ash. Simply stated, taxes are due on what is consumed (calcium carbonate), not what goes into what is produced • (ash).
Such an apportionment would be based on the value of the limestone consumed (the calcium carbonate) and the value of what remains of the limestone for incorporation into the ash. ■ The market value of the ash would be an important, factor in determining this apportionment. Such an interpretation of these statutory provisions is in accord with the language of La. R.S. 47:302(A) and La. R.S. 47:301(10), particularly La. R:S. 47:301(10)(c)(i)(áa), which limits the applicability. of the-exclusion to those materials “further processed] into articles of tangible personal property for sale at retail.” Furthermore, La. R.S. 47:301(10)(c)(i)(aa) does not indicate that the entire purchase of a raw material must be either taxable or nontaxable. The fact that expert testimony may be needed to determine what portion of the sale of raw material to Nelson constitutes a “sale at retail” as contemplated by La. R.S. 47:301(10)(a) for purposes of computing sales and use tax should not preclude the adoption of this statutorily authorized approach.
*298 | fiFailure to adopt a divisible sale approach would allow the purchaser of raw materials to escape the payment of sales tax on that portion of the raw materials consumed in the manufacturing process of which the purchaser/manufacturer is the ultimate consumer. Because the portion of raw material consumed during the manufacturing process forms no part • of end products in this case (electricity, steam and, ash), the purchasers of those end products would .not be the ultimate con.sumers on which the sales tax burden would lie. This case does not involve an issue of double taxation, rather it involves an issue of tax avoidance as to the portion of the limestone that is consumed by Nelson. The majority opinion provides the taxpayer (Nelson) with a windfall by finding that the entire purchase price of the limestone qualifies for the further processing exclusion despite that the, taxpayer (Nelson) is the ultimate consumer of the most valuable component of the limestone. However, the taxpayer (Nelson) should not be taxed on the additional raw material that is used to make an end product for sale at retail that it had the, innovation and creativity to produce, market, and sell.
In summary, Nelson is the ultimate consumer of that portion of the limestone that is consumed during the manufacturing process of electricity and steam and thus is responsible for the payment of sales tax on the amount to be consumed in its manufác-turing process. As an incidental benefit of the divisible sale approach, businesses would' be encouraged to -be creative and innovative in their efforts to fashion other revenue sources which benefit the economy and, as in this instance, make a marketable product as opposed to generating disposable waste.
Accordingly, I respectfully dissent in part from the- majority opinion. In all other respects, I agree with the majority opinion.

. See Bridges v. Nelson Indus. Steam Co., 15-1439, Op. at 279 (La.5/3/16).

. Notably, the distinction between an exclusion and an exemption (of which the legislature should be aware) has been blurred due to the significance attached the classification, which bears on the burden of proof imposed on the parties to an action.

. See Bridges,. 15-1439, Op. at 281.

. See Bridges, 15-1439, Op. at 280-82.

. See International Paper, 07-1.15.1 at 21, 972 So.2d at 1135 (in which this court dispelled the idea of a primary purpose test, implying that the pulpóse m'ay be a secondary or tertiary purpose).

.Furthermore, ■ La. R.S. 47:301(10)(c)(i)(aa) does not preclude a byproduct from qualifying as an “article [] of tangible personal property,” and the International Paper test does not preclude a byproduct from qualifying as an “end product! ].” International Paper, 07-1151 at 21, 972 So.2d at 1135.

. As noted by the majority, Nelson buys. $46 million worth of limestone, which results in the production of $6.8 million worth of ash. See Bridges, 15-1439, Op. at 283-84. The majority awards a tax-free pass on the entire $46 million limestone purchase. The fallacy of that award is no business would be in business if it spent $46 million on a raw material to produce an end product that sells for only $6.8 million. The statute does not sanction that absurdity. See La. R.S. 1:4 (“When the wording of a Section is clear and ■free of ambiguity, the letter .of it shall not be disregarded under the pretext of pursuing its spirit.”); La. C.C. art. 9 ("When a law is clear and unambiguous and its application does not lead to absurd-consequences, the law shall be applied as written_”).

. This case differs from those in which -only a small amount of the material in question appears in the end product. See e.g., Vulcan Foundry, Inc., 414 So.2d at 1199 (on reh’g).