# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #025

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **3rd day of May, 2016**, are as follows:

**BY CLARK, J.**:

2015-C -1439    CYNTHIA BRIDGES, SEC., DEPT. OF REV., STATE OF LOUISIANA v. NELSON INDUSTRIAL STEAM CO. C/W NELSON INDUSTRIAL STEAM CO. v. CALCASIEU PARISH SCHOOL SYSTEM SALES AND USE TAX DEPT., ET AL. C/W CYNTHIA BRIDGES, SEC., DEPT. OF REV., STATE OF LOUISIANA v. NELSON INDUSTRIAL STEAM CO. C/W NELSON INDUSTRIAL STEAM CO. v. CALCASIEU PARISH SCHOOL SYSTEM SALES AND USE TAX DEPT., ET AL. (Parish of Calcasieu)

For the reasons expressed herein and consistent with the liberal statutory construction that is afforded to a taxpayer claiming an exclusion, we reverse and rule in favor of NISCO.  We remand the matter to the trial court to fix the amount of the judgment in a manner consistent with this opinion.
REVERSED AND REMANDED.

KNOLL, J., dissents and assigns reasons.
WEIMER, J., concurs in part and dissents in part and assigns reasons.
HUGHES, J., concurs in part and dissents in part for the reasons of Weimer, J.

SUPREME COURT OF LOUISIANA

NO. 2015-C-1439

CYNTHIA BRIDGES, SEC., DEPT. OF REV., STATE OF LOUISIANA VERSUS NELSON INDUSTRIAL STEAM CO.

CONSOLIDATED WITH

NELSON INDUSTRIAL STEAM CO.VERSUS CALCASIEU PARISH SCHOOL SYSTEM SALES AND USE TAX DEPT., ET AL.

CONSOLIDATED WITH

CYNTHIA BRIDGES, SEC., DEPT. OF REV., STATE OF LOUISIANA VERSUS NELSON INDUSTRIAL STEAM CO.

CONSOLIDATED WITH

NELSON INDUSTRIAL STEAM CO. VERSUS CALCASIEU PARISH SCHOOL SYSTEM SALES AND USE TAX DEPT., ET AL.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, THIRD CIRCUIT, PARISH OF CALCASIEU

CLARK, J.

Nelson Industrial Steam Company ("NISCO") is in the business of generating electric power in Lake Charles, Louisiana. As part of its venture, NISCO sells multiple products: steam, electricity and ash. Limestone is bought and used for the dual purpose of inhibiting sulfur in the production of electricity *and* producing ash. NISCO asserts its purchase of limestone, with respect to its production of ash, is subject to the "further processing exclusion" of La. R.S. 47:301(10)(c)(i)(aa), which narrows the scope of taxable sales.[1] We granted NISCO's writ application to determine the taxability of the limestone. To resolve this issue, we determined that the dual purpose for the raw material could be considered and a by-product could be analyzed as the end product when

---

[1] La. R.S. 47:301(10)(c)(i)(aa) provides: "The term 'sale at retail' does not include sale of materials for further processing into articles of tangible personal property for sale at retail."

ascertaining the purpose for which the limestone was bought. For the reasons that follow, we reverse the lower courts and rule in favor of NISCO.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1988, Gulf State Utilities (now "Entergy"), Citco, Conoco, and Vista (now "Sasol") entered into a partnership (known as "NISCO") to own, construct, design, and control electric power generating facilities in Lake Charles, Louisiana. Originally, NISCO used natural gas to produce electricity and steam, but it ultimately converted to "circulated fluidized boilers" (CFB) technology, which uses petroleum-coke ("petcoke") as fuel for the manufacturing of the electricity and steam. The CFB technology causes sulfur emissions. In order to comply with state and federal environmental regulations, NISCO introduces limestone into the process, which acts as a sulfur inhibitor, or a "scrubbing agent." Additionally, and simultaneously, the limestone chemically reacts with the sulfur to make ash, which NISCO then sells to LA Ash, for a profit of roughly $6.8 million annually. LA Ash sells the ash to its customers for varying commercial purposes, including roads, construction projects, environmental remediation, etc.

In light of the limestone being further processed into ash and then sold, NISCO views the purchase of this raw material as subject to the "further processing exclusion" and, thus, untaxable. Accordingly, it did not pay sales tax on its purchase of limestone. The Louisiana Department of Revenue and the Calcasieu Parish School System, (collectively the "Tax Collectors"), did not tax the purchase of the limestone for many years. However, they now argue the limestone is taxable and not subject to any exclusion. The competing positions resulted in four consolidated cases concerning the collection of sales tax on NISCO's purchase of limestone for the tax periods of 2005-2007, 2007-2009, 2008-2012, and 2010-2012.[2]

---

[2] The overlap of the tax periods is a result of different state and local tax periods; additionally, the Louisiana

2

The trial court considered competing motions for summary judgment and granted the Tax Collectors' motion. The court of appeal affirmed.[3] This court reversed, finding genuine issues of material fact remained.[4] A two-day trial ensued, and the trial court again ruled in favor of the Tax Collectors, finding the limestone to be taxable. In its reasons for judgment, the trial court explained:

> It is indisputable that the [CFB] technology process NISCO employs in its production of steam and electricity requires the use of limestone. And, unavoidably, also produces ash, which it sells---NISCO sells. It is also indisputable that limestone in any form, or its component parts, are not found in the steam and electricity produced. Just because the ash is an incidental byproduct of the [CFB] process, its production, even in combination with the production of steam and electricity, does not in and of itself permit NISCO to claim the benefit of the further processing tax exclusion of its purchase of limestone.

The court of appeal affirmed, giving particular emphasis to the nature of the ash as an incidental by-product, which generated only 1% of NISCO's sale of electricity, and finding the purpose of the venture (and the accompanying purchase of the limestone) was to produce electricity.[5] Judge Connery dissented, observing the "further processing provision" is a tax *exclusion*, which is to be liberally construed in favor of the taxpayer. Further, Judge Connery noted the majority improperly placed the burden on NISCO to prove entitlement to the exclusion when it should have been placed on the Tax Collectors to establish that the exclusion did not apply.

NISCO filed a writ application, which this court granted to determine the applicability of the "further processing exclusion" to the limestone at issue.[6]

## STANDARDS OF REVIEW

A court of appeal may not set aside a trial court's or a jury's finding of fact

---

Department of Revenue is attempting to collect taxes in two of the suits, while NISCO is seeking a refund of local taxes it paid under protest in the other two suits.

[3] *Bridges v. Nelson Industrial Steam Co.*, 12-477 (La. App. 3 Cir. 11/7/12), 106 So.3d 147.

[4] *Bridges v. Nelson Industrial Steam Co.*, 13-171 (La. 3/8/13), 108 So.3d 1168.

[5] *Bridges v. Nelson Industrial Steam Co.*, 14-1250 (La. App. 3 Cir. 6/24/15), 169 So.3d 711.

[6] *Bridges v. Nelson Industrial Steam Co.*, 15-1439 (La. 10/30/15), 179 So.3d 610.

in the absence of "manifest error" or unless it is "clearly wrong."[7]  However, when reviewing courts find that a reversible error of law was made in the lower court, appellate courts are required to re-determine the facts *de novo* from the entire record and render a judgment on the merits.[8]

As our discussion below will illustrate, the purpose for which the raw material is purchased is an important inquiry in determining the availability of the "further processing exclusion."  The Tax Collectors contend that the lower courts' determination regarding the purpose for the purchase of the limestone is a factual finding, subject to the manifest error standard of review.  While this is a tenable argument, a deeper look at the trial court's reasons for ruling and the court of appeal's affirmation thereof, reveals an error in their legal analysis, requiring this court to conduct a *de novo* review of the record.  Namely, we find the lower courts committed legal error in narrowing their analysis solely to the end product of electricity and not considering the end product of ash, thereby interjecting a "primary product" test (or alternatively, a "business purpose" test), which is not rooted in any statutory, regulatory, or jurisprudential authority.  Further, we find the lower courts imposed, perhaps in a veiled manner, a "primary purpose" test, which has previously been jurisprudentially rejected, as will be discussed later. Accordingly, we will conduct a *de novo* review.

## DISCUSSION

Generally, sales taxes are levied on articles of tangible personal property. La. R.S. 47:302 provides:

> There is hereby levied a tax upon sale at retail, the use, the consumption, the distribution, and the storage for use or consumption in this state, of each item or article of tangible personal property, as defined herein . . .

La. R.S. 47:301(10)(a)(i) defines "sale at retail" as "a sale to a consumer to

---

[7]  *Rosell v. ESCO,* 549  So.2d 840 (La.1989).

[8]  *Id.*

4

any other person or for any purpose other than for resale as tangible personal property." By statutory exclusion, the term "sale at retail" does not include "sales of materials for further processing into articles of tangible personal property." La. R.S 47:301(1)(a)(i)(c)(i)(aa). Thus, resolution of this matter depends entirely on the interpretation of this "further processing exclusion."

When a law is clear and unambiguous and its application does not lead to absurd consequences, no further search into the legislative intent is permitted or required.[9] However, the jurisprudential test created over the last few decades, which was necessitated by litigation concerning the exclusion's scope, and the regulation promulgated by the Louisiana Department of Revenue,[10] which was drafted to aid in deciphering the meaning of the "further processing exclusion," clearly evidence inherent ambiguity in the provision. Thus, we look to our rules of statutory construction for guidance. In *Harrah's Bossier City Inv. Co., LLC v. Bridges*, 09-1916, pp. 9-10 (La. 5/11/10), 41 So.3d 438, 446, this court explained the difference between a tax exclusion and a tax exemption, and the opposing legal maxims that accompany them:

> Unfortunately, the Legislature has not provided a statutory definition of either an "exemption" or an "exclusion." According to the leading Louisiana sales tax treatise, a "tax exemption is a provision that exempts from tax a transaction that would, in the absence of the exemption, otherwise be subject to tax. That is, there has been a statutory decision not to tax a certain transaction that is clearly within the ambit and authority of the taxing statutes to tax." Bruce J. Oreck, *Louisiana Sales & Use Taxation* (2d ed.1996), § 3.1. An exclusion, on the other hand, "relates to a transaction that is not taxable because it falls outside the scope of the statute giving rise to the tax, *ab initio.* Transactions excluded from the tax are those which, by the language of the statutes, are defined as beyond the reach of the tax." *Id.* Oreck's definitions have been widely adopted by Louisiana courts.

> There are also two seemingly contradictory jurisprudential maxims at play. Tax exemptions are strictly construed in favor of the State and "must be clearly and unequivocally and affirmatively

---

[9] La. Civ. Code art. 9 and La. R.S. 1:4.

[10] *See* LAC 61:I:4301, discussed *infra.*

5

established" by the taxpayer. *Vulcan Foundry, Inc. v. McNamara,* 414 So.2d 1193, 1197 (La.1982). Exclusions, on the other hand, are "construed liberally in favor of the taxpayers and against the taxing authority." *Wyesco of Louisiana, LLC v. East Feliciana Parish School Board,* 2000–1322, p. 5 (La.App. 1 Cir. 9/28/01), 809 So.2d 401, 404, *citing Tarver v. World Ship Supply, Inc.,* 615 So.2d 423, 426 (La.App. 4 Cir.1993), *writ denied,* 616 So.2d 672 (La.1993). [Footnotes omitted].

The majority's opinion in *Traigle v. PPG Industries, Inc.*, 332 So.2d 777, 782 (La. 1976), which included the first major examination of the "further processing exclusion," acknowledged these principles of statutory construction, but declined to specify which was applicable and avoided categorizing the provision. It looked, instead, to legislative intent as the ultimate "aim of all of these principles."[11]

Although the "further processing exclusion" is deemed neither an exclusion nor an exemption in the statute itself, as we stated in *Harrah's Bossier City*, 41 So.3d at 450:

> There are no "magic words" necessary to create an exemption or an exclusion; *the determining factor is the effect of the statute*: "the words and form used legislatively in granting an exemption are not important if, in their essence, the Legislature creates an exemption." *Wooden v. Louisiana Tax Commission*, 94-2481 (La. 2/20/95), 650 So.2d 1157, 1161, citing *Meyers v. Flournoy*, 209 La. 812, 25 So.2d 601 (1946). [Emphasis added].

This court has determined the "further processing exclusion" was designed "to eliminate the tax on the sale of a material purchased for further processing into finished products and to place the tax on the ultimate consumer of the finished product processed from the raw material."[12] This court's findings regarding the purpose of the provision, together with this provision's placement in the definition section, rather than in La. R.S. 47:305 with many clear "exemptions," indicate that the legislature meant this provision to be a limitation *ab initio* on the definition of

---

[11] *Id.*

[12] *BP Oil Co. v. Plaquemines Par. Gov't*, 93-1109, p. 12 (La. 9/6/94), 651 So2d 1322, 1330, *on reh'g* (Oct. 13, 1994).

"sale at retail." Thus, it seems the "further processing provision" is an exclusion. Indeed, this conclusion follows logically from the underlying principle that "sales at retail" are subject to sales tax but sales "for resale" including, by extension, sales of materials for further processing *before* resale, are categorically not considered "sales at retail," because the buyer is not the ultimate consumer. Thus, we find the provision at issue is an exclusion and will be liberally construed in favor of the taxpayer, NISCO.

To further assist in our understanding of this statute, we turn now to other interpretative tools at our disposal. The Louisiana Department of Revenue promulgated an administrative regulation to provide guidance on the exclusion's meaning. La. Admin. Code, Title 61, Part I, § 4301, *Retail Sale or Sale at Retail* (d) provides:

> Sales of materials for further processing into articles of tangible personal property for subsequent sale at retail do not constitute retail sales. This exemption does not cover materials which are used in any process by which tangible personal property is produced, but only those materials which themselves are further processed into tangible personal property. *Whether materials are further processed or simply used in the processing activity will depend entirely upon an analysis of the end product.* Although any particular materials may be fully used, consumed, absorbed, dissipated or otherwise completely disappear during processing, if it does not *become a recognizable and identifiable component which is of some benefit to the end product*, it is not exempt under this provision. The fact that a material remained as a recognizable component of an end product by accident because the cost of removal from the end product was prohibitive or for any other reason, if it does not benefit the property by its presence, it was not material for further processing and the sale is not exempt under this provision. [Emphasis added].

Over the decades, this court has added a judicial gloss to aid in the understanding of what is contemplated by the statutory language of "materials further process[ed] into articles of tangible personal property." La. R.S 47:301(1)(a)(i)(c)(i)(aa). In 1976, this court in *Traigle,* 332 So.2d at 781, recognized a "purpose" requirement, distinguishing those materials which were purchased for "processing 'into' the finished article" from those materials

7

purchased "only to be used in the process of producing the manufactured product for sale." A few years later, this court in *Vulcan Foundry, Inc. v. McNamara*, 414 So.2d 1193 (La. 1981), reiterated the "purpose" factor in the test for determining the ultimate consumer of the raw material. Finally, this court in *International Paper, Inc. v. Bridges*, 07-1151, p. 19 (La. 1/16/08), 972 So.2d 1121, 1134 succinctly captured the analysis for determining the "further processing exclusion's" applicability to a raw material by framing it in a three-part test:

> From this rule, we recognize that raw materials "further processed" into end products are excluded from the sales and use tax provisions when: (1) the raw materials become *recognizable* and *identifiable components* of the end products; (2) the raw materials are *beneficial* to the end products; (3) the raw materials are *materials for further processing*, and as such, are purchased with the *purpose of inclusion* in the end products.

Armed with the proper test and the regulation's guidance that the end product is the starting part of the analysis, the facts of the instant case require us to determine which product is the proper "end product" for purposes of applying the three-part test. The trial court's reasons for ruling suggest that it viewed NISCO's electricity and steam as the end product. ("It is also indisputable that limestone in any form, or its component parts, are not found in the steam and electricity produced.") The court of appeal appears to have viewed the ash as the end product but was distracted by its characterization as a by-product. ("The true nature of the ash as an incidental by-product that cannot be seen as [a] co-product is evidenced in the Partnership Agreement.")[13] In any event, we must determine which product (electricity or ash) is the end product on which our entire analysis is centered and whether that product's status as a primary product or a by-product matters.

We find nothing in the law that requires the end product to be the enterprise's primary product. The plain language of the statute makes the

---

[13] *Bridges v. Nelson Industrial Steam Co.*, 169 So.2d at 722.

8

exclusion applicable to "articles of tangible personal property."[14]  There simply is no distinction between primary products and secondary products. Jurisprudentially, the *Traigle* court implicitly rejected a primary product test when it analyzed only the end product of chlorine, even though the taxpayer was in the business of making two additional saleable products (hydrogen and caustic soda). It only analyzed the chlorine because that was the only product that contained traceable amounts of the raw material at issue: carbon in the form of graphite anodes.  It set out to consider the taxability of the graphite anodes without performing any primary product analysis, nor did it seek to ascertain which product generated the most profit for the taxpayer.  Rather, the *Traigle* court simply analyzed the one product with traces of the raw material for which the advantage of the "further processing exclusion" was sought.  Thus, we find the lower courts committed legal error in not beginning their analysis with the ash as the end product, regardless of its nature as a by-product or a secondary product.  At the end of the day, the ash is produced and sold to LA Ash, making it an "article of tangible personal property for sale at retail."

Having identified the ash as the end product to be analyzed, it is important to understand its chemical make-up and the physical reactions at play in the manufacturing process.  As noted earlier, the petcoke used in the production of electricity releases sulfur when it is heated.  Limestone, which is made up of calcium, carbon, and oxygen (collectively, calcium carbonate), chemically reacts with the sulfur to make ash.  Specifically, the calcium and oxygen from the limestone (calcium oxide) and the sulfur from the petcoke combine to make ash (calcium sulfate).  Essentially all of the calcium and oxygen from the limestone and the sulfur from the petcoke remain in the final ash product.

We move forward with the three-part test and its application to the purchase

---

[14]  La. R.S. 47:301(10)(c)(i)(aa).

of the limestone for further processing into ash. The first two prongs of the test ask (1) whether the raw materials became *recognizable and identifiable* components of the end products and (2) whether the raw materials are *beneficial* to the end product. The Tax Collectors stipulated that these two elements were satisfied. However, out of an abundance of caution, we address the "benefit" factor insofar as we perceive the court of appeal's analysis may have confused this prong of the test. Specifically, the court of appeal focused on the fact that "NISCO did nothing purposeful to affect the quality of the ash[,]" making its chemical makeup "accidental."[15] It bases this conclusion on testimony and documents from and between NISCO management that testing was done on the limestone to determine its effect on the electricity produced, but not with regard to "how a particular quality limestone would impact the ash product."[16] Whether or not testing is performed to determine a particular kind of limestone's impact on the quality of the ash does not change the fact that the chemical make-up of the limestone is found in the ash and is an integral part thereof.[17] Indeed, as attested to by several NISCO managers and engineers and as undisputed by the Tax Collectors, without the calcium and oxygen from the limestone, the ash would not exist. Thus, we find the limestone, as an integral, component part of the ash, clearly satisfies the "benefit" prong of the *International Paper* test.[18]

The crux of this matter lies in the third prong, which seeks to ascertain whether the raw materials are purchased for *the purpose of inclusion* in the end

---

[15] *Bridges v. Nelson Industrial Steam Co.*, 169 So.2d at 720.

[16] *Id.*

[17] While we find quality testing is irrelevant to the "benefit" factor, we nevertheless note the record testimony that establishes that there was no impact on the quality of the ash from the change in the limestone source or quality of the limestone. Thus, testing for quality control, though not required to satisfy the "benefit" prong, would have been unnecessary anyway.

[18] We note, and reject, the Tax Collectors' position that the ash was a residue or waste product left over from the production of steam and electricity. In attempting to characterize the ash as an impurity, the Tax Collectors rely on language in the *Vulcan* decision that raw materials that only incidentally benefit the end product do not meet the purpose requirement and are, thus, taxable. Because the limestone is crucial to, and an elemental part of, the end product of ash, we distinguish the instant case from the holding of *Vulcan* in this respect. Moreover, to the extent the Tax Collectors contend the raw material must be beneficial to the taxpayer's business, we herein reject that for the same reasons we reject a primary product test.

product. The lower courts found NISCO did not purchase the limestone for the purpose of including it in the ash. The Tax Collectors frame this as a fact to be believed or rejected. However, we find the lower courts' misunderstanding of the "purpose" test interdicted the fact-finding process, such that the finding regarding the purpose for the purchase of the limestone was the result of an improper legal analysis. This court in *International Paper* expressly rejected a "primary purpose" test. In that case, the taxpayer used three chemicals in its production of paper. Those chemicals had a dual purpose of (1) removing/modifying lignin, which has a brown color, from the pulp (acting as a whitening agent) and (2) adding chemical components to the final product. The taxing authority sought to tax the chemicals because they were not purchased for the *primary* purpose of being incorporated into the final paper product, while the taxpayer wanted to claim the "further processing exclusion" because the chemicals were *additionally* purchased to be included in the end product. The court, in rejecting the "primary purpose" test, allowed a dual or multiple purpose test, so long as one of those purposes was "inclusion in the end product." *International Paper*, 972 So.2d at 1134.

The lower courts in the instant case concentrated on the following facts:

- NISCO's business manager testified that NISCO would not purchase limestone if NISCO was no longer producing electricity or if limestone was no longer needed in the production of electricity (*i.e.,* if sulfur emissions no longer were regulated or a new fuel was used).

- During the relevant tax periods, NISCO generated $739 million in electricity sales, but only $6.8 million in ash sales, making the ratio of electricity sales to ash sales almost one hundred to one.

- The cost of limestone was $46 million, roughly $39 million more than the revenue produced by the ash.

- NISCO's overall business purpose was to make and sell electricity and steam, as evidenced by its Partnership Agreement.

We find that the lower courts' emphasis on these facts reveals that they

11

improperly considered irrelevant information in determining whether the limestone was purchased for the purpose of inclusion in the final product of ash. These above-referenced factual considerations are relevant only to an inquiry regarding NISCO's *primary* purpose for buying the raw materials, a test that we have already jurisprudentially rejected. (*See International Paper*, supra). Also, a focus on (or even a mere mention of) a comparative profit analysis between the end products of electricity and ash and, additionally, a cost-versus-revenue analysis of the limestone and the ash, suggest that an "economic" component was added to the exclusive three-prong test. Such a test has no statutory, jurisprudential, or regulatory roots, nor does a "business purpose" test that seeks to establish the purpose of the taxpayer's business.

The "further processing exclusion" simply seeks to ensure that double taxation is avoided by only taxing the ultimate consumer. To determine the rightful taxpayer of the raw material's sales tax, only the manufacturing process (and the physical and chemical components of the materials involved therein) is germane to the "purpose" test. Thus, the only question to ask is whether the limestone was purchased with the purpose (although not necessarily the *primary* purpose) of inclusion in the final product of ash. We find the record undeniably supports an affirmative answer to this inquiry.

The purpose to produce and sell ash is evidenced in the "Partnership Agreement's" language that NISCO would (1) conduct "any activities related" to the manufacture of electricity and steam,[19] (2) construct substantial "New Facilities", which contemplated the handling and sorting of the ash, and (3) receive income from the ash sales. Undisputed testimony established that NISCO actively

---

[19] The "Purpose" of NISCO's business ventured, as stated in the "Partnership Agreement" is:

> The venture is created, and shall be conducted, for the purpose of designing, constructing, owning, operating, and controlling electric power generating facilities in the Lake Charles, Louisiana area, and producing electricity for sale to [Gulf States Energy] and steam to supply all or a portion of the steam needs of the industrial facilities of the Industrial Participants in the Lake Charles area, and *conducting any activities related thereto or contemplated by this Agreement*." [Emphasis added.]

purchased equipment specifically designed for the production of ash and sought a buyer for its ash. For the last twenty-two years, NISCO has sold one hundred percent of its ash product. NISCO's current contract with its limestone supplier recognizes that the limestone will be used for the two-fold purpose of absorbing sulfur released by the petcoke *and* producing ash as a saleable product. As stated earlier, the ash brings in roughly $6.8 million in revenue. The Tax Collectors, and the court of appeal, emphasize the ash's comparatively small profit as it relates to the electricity sales and the cost of the limestone itself. However, nothing in the statute or case law leads us to conclude that those are relevant factors in the analysis. The fact that the ash profit contributes to NISCO's bottom line and acts as a cost offset, rather than the company's principal income, does not change the fact that the ash is still an article of tangible personal property that will be resold to another consumer, who will bear the ultimate burden of taxation. Accordingly, we find NISCO's purposeful decisions related to engineering, infrastructure, and marketing lead to the only possible conclusion that the limestone was purchased with the purpose—perhaps not the sole or primary purpose, but the purpose nonetheless—of making a saleable end product of ash. Since the limestone is a recognizable, identifiable, beneficial material bought for the purpose of inclusion in the ash product, we find it qualifies for the "further processing exclusion."

In finding NISCO's purchase of limestone is excluded from sales tax, we decline to adopt a compromise approach espoused by the Tax Collectors and addressed during oral argument. Such an approach to the taxation of raw materials for further processing contemplates apportioning the tax exclusion based upon the percentage of the material that ends up in the final product. Justice Marcus, in the *Traigle* opinion, concurred in part and dissented in part, stating that in his view, the tax collector should be able to assess taxes on the portion of the raw material that "is not processed into the product but rather is discarded by the manufacturer as

13

industrial waste."[20]  No majority opinion has ever adopted this approach, nor is there any statutory authority to support this divisible taxing theory.  Additionally, from a practical standpoint, there lacks clear guidelines on how to divide the tax. For instance, one could argue, like Justice Marcus, that the tax could be based on the percentage of the materials used up in the process. The unique manufacturing process of each product, though, prevents the articulation of a precise test by which to measure the exclusion's applicability.  In *Traigle*, a percentage of the graphite anodes was discarded as waste.  In *Vulcan*, a portion of the coke was used to heat and melt scrap iron and also to add carbon to the end product.  In *International Paper*, only partial elements (portions of the oxygen atoms) from the three chemicals ended up in the paper.  Here, the calcium and oxygen from the limestone are component parts of the ash, while the carbon is not.  How would a court quantify an element's importance in a chemical reaction that ultimately produces an overall saleable product?

To this point, in *International Paper*, we made it clear that the end product does not have to be made up of the exact chemical and physical composition of the raw materials.  Specifically, we stated:

> However, our review of the applicable law and jurisprudence does not suggest that the raw materials *themselves* (*i.e.*, the exact chemical/physical compositions of the raw materials) must appear in the end products . . .
>
> * * *
>
> It would be illogical to assume that raw materials would be excluded from sales and use tax if those raw materials *themselves* were not used for incorporation into the final products; however, as we have already determined, nothing in the legislation, administrative rule, and/or jurisprudence mandates that the chemical/physical composition(s) of raw materials incorporated into end products remain the same after their incorporation into the final products.  We acknowledged this notion in *Vulcan* [supra], as in that case, we were dealing with the incorporation of *carbon* into the final products (*i.e., the iron castings*), yet the *carbon was derived from the raw material*, *i.e., coke.*

---

[20] *Traigle*, 332 So.2d at 783.

[Emphasis in original].[21]

Thus, this court has already considered the scope of the exclusion as it relates to an apportionment theory. Indeed, if the raw material were to appear in the exact same form both in its original state and in the end product, it could hardly be said that any "further processing" actually occurred. Because there is no requirement that the identical composition exist in the end product, there is no basis to put a value on certain elements that remain in the end product versus other elements that are used up in the process.

In the instant case, the Tax Collectors argue the valuable element in the raw material of limestone is the carbon and that the carbon is used up in the process of absorbing the sulfur emissions. Thus, they contend, a value should be placed on the carbon and taxed. They suggest using an economic value, whereby the cost of the limestone ($46 million) less the profit of the ash ($6.8 million) should be taxed. However, this approach would result in a battle of the experts, wherein economists, with the help of chemists, would be called upon to put price tags on individual elements that make up a compound, when we have already acknowledged in *International Paper* that the incorporation of derivatives in an end product is sufficient for the exclusion's potential applicability. Moreover, a review of the record does not lead us to believe that the limestone's carbon is not used to produce the ash. While it is certainly used to inhibit the release of sulfur, testimony reveals that the moment the limestone is introduced into the process, ash is immediately created. Thus, from a factual standpoint, we cannot put a value on the carbon's role in the creation of the ash. Accordingly, for reasons rooted both in principle and in practicality, we decline to fashion a test that makes sales tax on the purchase of a single raw material divisible.

Last, we observe that both the court of appeal and the Tax Collectors

---

[21] *International Paper*, 972 So.2d at 1133-1134.

appeared to have viewed the taxability of the limestone from a policy-based viewpoint of common sense dictating against inequity. In other words, the exclusion should only apply to the manufacturing ingredients that lead to the enhanced value of the end product, and because NISCO spends $39 million more in its limestone purchase than it makes in its ash sales, there is an injustice that results from excluding that purchase from the payment of sales tax. However, we see no requirement that the end product must boast an increased value or generate a certain profit. At this point, we feel compelled to note that if the legislature chooses to narrow the "further processing exclusion" by way of requiring a profit, or writing into law a new test that embodies a "primary product" or "primary purpose" factor, or otherwise adding an economy-based consideration, we will adhere to our constitutionally delineated role of applying that new law. Until then, we note the existing expression of legislative intent in SCR 136 (2007 Reg. Sess.), which encourages courts and the Louisiana Department of Revenue to adhere to the exclusive three-prong test set forth by the courts. Particularly, the legislature recognized that many other states do not tax *any* raw materials used in the manufacturing of products for resale. Deviation from this three-prong test, as warned by the legislature, could "undermine the efforts of Louisiana to attract additional investment dollars in the state."[22] Accordingly, we find the conclusion reached herein best comports with the legislative intent regarding taxation of materials further processed into articles of tangible personal property.

## CONCLUSION

We find NISCO's by-product of ash is the appropriate end product to analyze for purposes of determining the "further processing exclusion's" applicability to the purchase of limestone. Moreover, under a proper "purpose" test, the third prong of the three-part inquiry enunciated in *International Paper* is

---

[22] SCR 136 (2007 Reg. Sess.)

16

satisfied, as evidenced by NISCO's choice of manufacturing process and technology, its contractual language utilized in its purchasing of the limestone, and its subsequent marketing and sale of the ash. For the reasons expressed herein and consistent with the liberal statutory construction that is afforded to a taxpayer claiming an exclusion, we reverse and rule in favor of NISCO. We remand the matter to the trial court to fix the amount of the judgment in a manner consistent with this opinion.

**REVERSED AND REMANDED.**

SUPREME COURT OF LOUISIANA

NO. 2015-C-1439

CYNTHIA BRIDGES, SEC., DEPT. OF REV., STATE OF LOUISIANA
VERSUS NELSON INDUSTRIAL STEAM CO.

CONSOLIDATED WITH

NELSON INDUSTRIAL STEAM CO.VERSUS CALCASIEU PARISH
SCHOOL SYSTEM SALES AND USE TAX DEPT., ET AL.

CONSOLIDATED WITH

CYNTHIA BRIDGES, SEC., DEPT. OF REV., STATE OF LOUISIANA
VERSUS NELSON INDUSTRIAL STEAM CO.

CONSOLIDATED WITH

NELSON INDUSTRIAL STEAM CO. VERSUS CALCASIEU PARISH
SCHOOL SYSTEM SALES AND USE TAX DEPT., ET AL.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
THIRD CIRCUIT, PARISH OF CALCASIEU

**KNOLL, J., dissents.**

I dissent from the majority's holding in this case, which opens the door to exempting from sales tax all purchases for consumption where the purchaser's process results in an incidental by-product that is salvageable or saleable. The majority's conclusion that "only the manufacturing process (and the physical and chemical components of the materials involved therein) is germane to the 'purpose test,'" unnecessarily forecloses consideration of relevant evidence and is highly likely to invite taxpayer abuse, effecting unintended results which will negatively impact Louisiana's already-suffering public fisc. To use an extreme example—cow manure and chicken excretions are very good fertilizers. Large cattle and chicken operations could (and probably do) collect the waste and sell it to the fertilizer industry. Under the majority's policy, the cattle and poultry industries could qualify for a tax exemption on the purchase of food for their animals' consumption

under the "further processing exclusion."

Endless creative "sales" of residual waste materials or recyclables for the purpose of evading taxes are likely if not inevitable under the majority's holding. As one amicus brief pointed out, contractors could escape tax on all of their purchase of materials by selling scrap wood as mulch or particleboard, claiming they really purchased all of their lumber for "the purpose of" selling mulch and particleboard. Even the tobacco industry could be transformed, as Calcasieu Parish's brief quipped, if the industry could dream up a way for their customers to sell cigarette ash.

Here, the lower courts recognized that the limestone at issue was purchased for use in the manufacturing process of electricity and steam, wherein the use of the limestone in the process generated an unavoidable burnt residue, ash, which is a saleable product. I strenuously disagree with the majority's finding that the Court of Appeal applied a "primary purpose" test in reaching this conclusion. Rather, I find the lower courts correctly applied the law and simply did not believe NISCO's assertion that it had made the purchases at issue for the purpose of producing ash **at all**, even as a "secondary" or "co-product." This finding, as detailed below, is well-supported by law, jurisprudence, and the record in this case.

During the relevant periods, NISCO expended in excess of **$46 million dollars** on sand and limestone, generated approximately **$739 million dollars** in revenue from electricity sales, and made less than **$6.8 million dollars** from the sale of ash. NISCO argues it should not be required to pay sales tax on the limestone purchased because, although it clearly needs the limestone to capture sulfur emissions, NISCO asserts it intentionally purchased limestone for the *additional purpose* of manufacturing ash. After a two-day trial on the merits which included all four suits, the trial court ruled against NISCO on all claims, stating its reasons for judgment in open court:

2

It is indisputable that the technology process NISCO employs in its production of steam and electricity requires the use of limestone. And, unavoidably, also produces ash, which it sells—NISCO sells. It is also indisputable that limestone in any form, or its component parts, are not found in the steam and electricity produced. Just because the ash is an incidental byproduct of the process, its production, even in combination with the production of steam and electricity, does not in and of itself permit NISCO to claim the benefit of the further processing tax exclusion of its purchase of limestone.

The Court of Appeal affirmed, applying the three-pronged test enunciated by this Court in *International Paper v. Bridges,* 07-1151 (La. 1/16/08), 972 So.2d 1121, and finding, as is discussed in greater detail below, "the record does not support NISCO's argument that it purchased the limestone for the purpose of incorporating it into a co-product, the ash."[1] Although I agree with the majority's finding the provision at issue is an exclusion, even applying liberal statutory construction in favor of NISCO, I find the lower courts properly construed the statute and concluded NISCO's purchases did not fall under the exclusion.

This Court first closely examined the "further processing exclusion" in *Traigle v. PPG Industries,* 332 So.2d 777 (La. 1976). Writing for the Court, Justice Tate explained the graphite purchased by a manufacturer could not be regarded as having been purchased for the purpose of processing "into" the finished product, and therefore, the taxpayer could not avoid paying sales taxes. The Court framed the question as:

> [T]he precise issue of tax law relates to whether, under a tax definition, the graphite is used by the manufacturer as an ultimate consumer, as in the case of machinery or fuel (for which a sales/use tax is due when purchased by it); or whether, instead, the graphite is processed into the final product, so that the purchase of the latter, as the ultimate consumer, pays the tax (not the manufacturer). [2]

After reviewing the manufacturer's process of chlorine production at length, the Court concluded the manufacturer was indeed the ultimate consumer of the graphite at issue, because, even though "waste carbon dioxides" from the graphite

---

[1] *Bridges v. Nelson Indus. Steam,* 14-1250, pp. 8, 18 (La.App. 3 Cir. 6/24/15), 169 So.2d 711, 716, 721.

[2] *Id.* at 779.

3

remained in the final product, this matter constituted "waste materials in the chemical reaction, **the purpose of which was to produce chlorine** (not carbon oxides) for sale at retail."[3]

Similarly, a few years later, this Court in *Vulcan Foundry, Inc. v. McNamara,* 414 So.2d 1193 (La. 1983), examined whether the plaintiff-taxpayer owed sales tax on coke purchased for use in manufacturing manhole covers and rims. Although the Court originally found the purchase exempt under La. R.S. § 47:305(4), which exempts boiler fuels from sales tax, on rehearing the Court found the exemption inapplicable and proceeded to the issue of whether the "further processing exclusion" applied. In its original opinion, after explaining Vulcan's manufacturing process, the Court noted, "although natural gas or electrical furnaces could be used, Vulcan uses coke in its process, not only because coke is an efficient fuel, but also because coke provides the additional benefit of adding carbon content to the finished product."[4] On rehearing, although the Court again noted "the presence of carbon in the final product is beneficial to Vulcan," it emphasized "[T]he proper inquiry, however **is the purpose for which the coke is bought.**"[5] Thus, the Court held:

> It is clear from the evidence in this case that coke is purchased for the purpose of heating the scrap iron; **the small amount of carbon in the finished product is incidental.** The fact that using coke as a fuel has a beneficial side effect does not change the purpose for which it is bought. Accordingly, we conclude that Vulcan's purchase of coke is as a "consumer" for a "purpose other than for resale," that is, for its use as a heat source to melt scrap iron and *not* for further processing into an article of tangible property for sale at retail.[6]

*Id.* at 1999 (emphasis added).

Our decision in *International Paper, Inc. v. Bridges,* 07-1151 (La. 1/6/08), 972 So.2d 1121, contains this Court's latest examination of the further processing

---

[3] *Id.* at 782 (emphasis added).
[4] *Id.* at 1994.
[5] *Id.* at 1198.
[6] *Id.* at 1999 (emphasis added).

4

exclusion. In *International Paper,* the Board of Tax Appeals ("Board") issued a decision finding certain chemicals purchased for the manufacture of white paper products were exempt from sales tax, applying the following analysis:

> ***The Secretary's <u>regulation</u>*** LAC 61:I:4301(10) ***and <u>the case law</u> provide*** that in order to be "material for further processing" as contemplated by the above statute, the raw materials or their component molecular parts must meet three criteria: (1) they must be of ***benefit*** to the end product; (2) they must be a ***recognizable and identifiable*** of the end product; and (3) they must have been purchased for the ***purpose of reprocessing*** into the end product.[7]

Examining the evidence in light of this test, the Board found the chemicals at issue **had been purchased to function as a source of the oxygen needed** in the bleaching process for creation of white paper products. The Board found a significant amount of the oxygen from the chemicals was **recognizable and identifiable** in the resulting bleached pulp. The Board also found the oxygen from the chemicals is **beneficial** to the bleached pulp. Thus, the Board found the chemicals met all three prongs of the test and qualified for the sales tax exclusion.[8]

The District Court affirmed, finding the Board's factual determinations were not manifestly erroneous. However, on appeal, the Second Circuit reversed the Board, holding the Board had committed an error of law in omitting a fourth prong of the test required to determine applicability of the "further processing exclusion."[9] In addition to the three requirements articulated by the Board, the Court of Appeal held the jurisprudence required "the primary purpose for the purchase of the material must to be to process into the end product."[10] Applying this additional prong to the facts, the Court observed, "Although the chemical reactions in the process [of bleaching the paper] involve adding oxygen atoms whose origins can be traced to the chemicals or processes in question, the purpose

---

[7] Board of Tax Appeals' written reasons for Judgment (10/28/2003), p. 2, *cited and emphasis added by International Paper, Inc. v. Bridges,* 972 So.2d at 1121.
[8] *Id.* at 1126.
[9] *International Paper, Inc. v. Bridges,* 42,023 (La. App. 2 Cir. 4/4/07); 954 So.2d 321.
[10] *Id.* at 11-21, 329-34.

of the chemicals is to process the lignin in the pulp for paper, not to incorporate raw materials (the chemicals) into the paper product."[11] Thus, the Court of Appeal found sales tax applied to the purchase of the chemicals.

This Court rejected the Second Circuit's added prong:

> [O]ur review of the applicable law and jurisprudence does not suggest that the raw materials *themselves* (*i.e.,* the exact chemical/physical compositions of the raw materials) must appear in the end products, nor does the law suggest that the *primary* purpose for the purchase of these raw materials must be their incorporation into the end products.[12]

Recognizing the "further processing exclusion" had been explained by LDR via an administrative rule[13] and examining this rule in light of Legislative intent, this Court pronounced:

> From this rule, we recognize that raw materials "further processed" into end products are excluded from the sales and use tax provisions when: (1) the raw materials become *recognizable and identifiable components* of the end products; (2) the raw materials are *beneficial* to the end products; and (3) the raw materials are *materials for further processing,* and as such, are purchased with the *purpose of inclusion* in the end products.[14]

Having found the Board applied the correct legal standard, this Court in *International Paper* held the Board's factual findings were *not* manifestly erroneous, noting "the record contains testimonial evidence suggesting that the presence of the oxygen with the final products was not only beneficial to these products, but necessary for their production."[15]

I find *International Paper* presents no legal obstacles for the lower courts' analysis and factual findings in this case. Importantly, this Court in *International Paper* declined to overrule its prior holding in *Vulcan,* where we had previously found a material was purchased for the *purpose* of consumption even though the end product contained a small but beneficial amount of a component of the raw

---

[11] *Id.*

[12] *International Paper, Inc. v. Bridges, supra,* p. 18, 972 So.2d at 1133.

[13] LAC 61:I.4301.

[14] *Id.* at 19, 1133-34.

[15] *Id.* at 21, 1136.

material at issue. Instead the Court in *International Paper* noted the purchase of coke at issue in *Vulcan* was made for a *purpose* (i.e., heat to melt scrap iron) other than inclusion in the final product, relying on the lower courts' factual findings the admittedly identifiable beneficial "presence of the carbon (a component of the coke)" in the final product was "***merely incidental* to the manufacturing process.**"[16] Likewise, in *International Paper*, we gave great deference to the Board's factual finding that the chemicals were purchased for the purpose of reprocessing into the paper products at issue. Although the Court upheld as *not* manifestly erroneous the Board's finding the chemicals at issue had been purchased for a dual purpose, this result does not foreclose future findings, such as those of the lower courts in this case, that the presence of a material in the end product is *merely incidental* rather than purposeful in any given instance.

Critically, neither *International Paper* nor other previous case law addressed the novel situation before us, where an inevitable by-product of the manufacturer's process is *itself* saleable. In *Traigle*, it was undisputed the graphite was purchased **for the purpose of** producing chlorine—the only question was whether the taxpayer was the <u>ultimate consumer</u> of the graphite or whether the graphite was purchased for further processing into the chlorine. In *Vulcan,* it was undisputed the coke was purchased **for the purpose of** producing manhole covers and rims— the only question was whether the taxpayer purchased the coke to consume it in the manufacturing process or whether the coke was purchased for further processing and incorporation into the manhole covers and rims. In *International Paper,* it was undisputed the chemicals at issue were purchased **for the purpose of** manufacturing white paper products, and the issue was whether chemicals were purchased in order to be consumed in the manufacturing process or to be further processed into those white paper products. In contrast, here, the lower courts found

---

[16] *Id.* at 17, 1133.

(1) the limestone was purchased by NISCO **for the purpose of** generating electricity and steam and (2) the ash was not an intentionally made product**,** but **merely incidental to the purpose** for which the limestone was purchased.

The majority cites LDR's regulation in support of its finding the "further processing exclusion" applies in this case. The relevant provision, found in a section titled "Uniform State and Local Sales Tax Definitions," under the heading "*Retail Sale or Sale at Retail*," states in pertinent part:

> b. While specific exclusions are provided in R.S. 47:301(10) with respect to **sales of materials for further processing into articles <u>for resale</u>** and with respect to casual, isolated, or occasional sales, and exemptions are provided for sales of particular items or classes of property by R.S. 47:305 and R.S. 47:305.1 through R.S. 47:305.52, **the intent of the law is to classify every sale made to the final user or consumer for any imaginable purpose, <u>other than for resale</u>, as a retail sale or a sale at retail.** For purposes of R.S. 47:301(10), whether a transaction is exempt from taxation by statute, jurisprudence, or by constitution has no bearing on classification of the transaction.

> d. <u>**Sales of materials for further processing** into articles of tangible personal property</u> **for subsequent sale at retail** do not constitute retail sales. This exemption does not cover materials which are used in any process by which tangible personal property is produced, but only those materials which themselves are further processed into tangible personal property. ***Whether materials are further processed or simply used <u>in the processing activity will depend entirely upon an analysis of the end product.</u>*** Although any particular materials may be fully used, consumed, absorbed, dissipated or otherwise completely disappear during processing, if it does not become a recognizable and identifiable component which is of some benefit to the end product, it is not exempt under this provision. The fact that a material remained as a recognizable component of an end product by accident because the cost of removal from the end product was prohibitive or for any other reason, if it does not benefit the property by its presence, [sic] it was not material for further processing and the sale is not exempt under this provision.[17]

The majority relies on the above-italicized sentence for the proposition this Court may *only* look to the contents of the end product —*i.e.*, the ash—to determine whether the "limestone" was further processed. However, this interpretation would require the reader to begin with the assumption that every conceivable saleable

---

[17] LAC 61:I.4301(C) (emphasis added).

product **was itself purposefully produced "for subsequent sale at retail."** I find the italicized sentence in the regulation above clearly provides guidance for situations, such as were presented in previous case law, where a raw material **was undisputedly purchased for a "processing activity" to produce the "end product" "<u>for subsequent sale at retail</u>,"** and the operative inquiry is whether the material was used up in the processing activity or became a recognizable, beneficial component of the intentionally-created end product. This case, however, presents the operative question of whether the "end product" itself, *i.e.*, ash, was even produced for the purpose of **"subsequent sale at retail" <u>at all</u>**. The characterization of ash as a by-product, while not determinative on its own, is not a *distraction*, as the majority insists, but is relevant to whether the manufacturer purchased the items at issue for the purpose of processing them for subsequent sale at retail or, as the lower courts found here, **for the purpose of consumption.**

Having found the lower courts applied the correct legal standard, I additionally note that my review of the record indicates the District Court's finding the production of ash was not purposeful but **<u>merely incidental</u>** to the generation of electricity and steam is well-supported by the record evidence. For example, the Tax Collectors introduced into evidence an email in which NISCO's business manager Sandi Boyles wrote:

> Sand is utilized in the NISCO process for injection into the circulating fluidized bed boiler along with petroleum coke **and limestone for the purpose of producing electricity for sale**.[18]

Furthermore, the record contains the following testimony of Ms. Boyles:

> Q: Would you purchase limestone to manufacture and sell ash if you didn't have the electricity to sell?
>
> A: That's not our business.
>
> Q: Okay, I understand that. I understand that's not your business. My question to you is: Would you or anybody construct a facility to purchase limestone for the sole purpose of producing ash and reselling

---

[18] (Emphasis added.)

ash?

A: No.

At another point, Ms. Boyles participated in the following exchange:

Q: Let's assume that you can no longer get anybody to pay you for the ash, okay, but they're willing to come and pick it up for free. So that basically the ash is taken off your hands, you don't pay anything, but you don't receive any revenue from it. You understand?

A: Yes.

Q: But you still need to generate electricity and generate that, roughly, 195 million dollars a year in revenue you're getting from electricity. Would you still buy the limestone?

A: More than likely, yes.

In a different email, Ms. Boyles wrote she "decided not to cover the ash analysis in the meeting on Thursday with the entire management team. Instead, I have attached the presentation for your review.... Please let me know if you have any questions or need further clarification." The attached presentation reviewed options for economical transfer of ash, including resale and disposal in a landfill. Slide one of the presentation described the types of ash generated at NISCO:

- Two types of ash: FLY and BED

    ○ Fly Ash - fine residue removed from stack glasses using various types of air quality control equipment. **The residue that remains after petcoke is burned consists primarily of lime, calcium carbonate and calcium sulfate.** Because of the high lime content, when hydrated, has a self-cementing effect.

    ○ Bed Ash - coarse, solid matter that sinks to the bottom of the fluidized bed combustion chamber and is periodically removed. Similar chemical composition to fly ash, but its form ranges from fine sand to small aggregate.[19]

Slide two discussed the variability in valuation of ash:

- The value of ash varies significantly among power plants depending on product quality, the plant's proximity to the market and product availability.

- A new power plant in Alexandria, LA is starting up in June

---

[19] (Emphasis added.)

2009 and is considering **selling its ash for only $2 - $3/ton**.

- **Other power plants are paying ash companies to take their ash because it's cheaper than putting it in a landfill**.[20]

The remainder of the presentation explained the considerable costs of using a landfill as well as the prospects of a different potential buyer for the ash. This slideshow demonstrated power plants **not only** do not generally produce ash intentionally **but also** will sell ash for a nominal price or even **pay** companies to take the ash residue from the process "**because it's cheaper than putting it in a landfill**."

Furthermore, the parties to the Partnership Agreement which formed NISCO agreed the ash would not be considered revenue but would generally be treated as a recoupment of costs of electricity production. Indeed, NISCO's facilities produced **no ash** in the first four years of NISCO's existence. NISCO's own expert witness testified:

> Q: And you agree with me, do you not, Dr. Scott, that ash is not the driver in this production process? It's the electricity that's the driver of this production process in NISCO's decisions, correct?
>
> A: That's exactly right.

The record indicates the vast majority of the value of the limestone is used up in its role of absorbing the sulfur emissions generated by burning of the petcoke. In testimony, LA Ash's President and CEO, Gary Livengood, stated NISCO does not use the ash or collect sales tax when it sells it to LA Ash. LA Ash re-sells the ash to government entities for construction and other applications and to commercial establishments, some of which sell the ash yet again.

The Tax Collectors' expert witness, Dr. Daryl Burckel, had been a financial officer for industrial corporations and testified in the area of tax and cost accounting. In his review of NISCO's voluminous documents, he characterized the ash as an incidental by-product and noted the sale of the ash constituted less than

---

[20] (Emphasis added.)

one percent of NISCO's sale of electricity. He testified NISCO purchased the limestone for the purpose of controlling sulfur emissions to meet permitting standards. Even though NISCO's attorney repeatedly asked Dr. Burckel to affirm NISCO had an additional purpose to make and to sell ash, Dr. Burckel answered: "Every one of those businesses are looking for every revenue stream that they can find; and just because they can find it doesn't mean that the purpose for which you buy a product changes. The purpose for that product, that I keep coming back to, was to inhibit sulfur...."

The Court of Appeal correctly noted this language hearkened back to this Court's observation in *Vulcan:*

> *The fact that using coke as a fuel has a beneficial side effect does not change the purpose for which it is bought.* Accordingly, we conclude that Vulcan's purchase of coke is "as a consumer" for a "purpose other than for resale," that is, for its use as a heat source to melt scrap iron and not for further processing into an article of tangible property for sale at retail.[21]

In short, the District Court simply had to determine whether it believed NISCO's assertion it was purchasing the limestone for purposes *including production of ash* or whether it agreed with the Tax Collectors' argument the ash is an incidental, unavoidable burnt residue rather than a purposefully-produced product. From the Tax Collectors' view, NISCO purchased the limestone to be its ultimate consumer and found a cost-saving mechanism for disposing of by-products leftover from its manufacturing process, i.e., sale of the ash. From the majority's view, as the Court of Appeal opinion quipped, "[I]t appears, then, that one of the ultimate consumers who finally pays the tax on NISCO's $46 million purchase of limestone is the neighbor John Doe who buys a sack of ash at Home Depot to put in the hole that he dug in his backyard in preparation of planting his new azalea bush." Clearly, the lower courts found NISCO's stated additional purpose for purchasing the limestone to be incredulous, instead finding NISCO the

---

[21] *Bridges,* 14-1250 at 19, 169 So.3d at 171, *quoting Vulcan,* 414 So.2d at 1199.

"ultimate consumer" of the material.

As to the other two prongs of the three pronged "further processing exclusion" test, it matters not whether the limestone is beneficial to the ash or recognizable or identifiable in the ash, because **the limestone was not purchased for the purpose of creating ash, thus clearly failing one of the required prongs.** Many manufacturing processes result in by-products or residues, which must be eliminated, either through disposal or sale in a secondary market. Resale of such by-products or residues is judicious and laudable, as it results in less waste in the environment and more cost-savings for the taxpayer. However, it still remains the taxpayer bought its original materials for the **purpose of** a manufacturing process which merely incidentally includes the unavoidable production of the by-product or residue.

In summary, I find the Third Circuit did not, as the majority insists, covertly insert a "primary purpose" requirement into the "further processing exception." Rather, the District Court and the appellate court simply did not *believe* NISCO's assertion that production of ash was even *one* of the purposes for which NISCO purchased this limestone. The record evidence amply supports the lower courts' position. As shown above, NISCO's corporate witness in its La. C.C.P. art. 1442 testimony testified NISCO would not buy limestone if it did not manufacture electricity, and NISCO would still buy the limestone if it could not sell the ash. Put another way, the operative question in this case is "Why [*i.e.,* for what purpose] does NISCO buy limestone?" Although NISCO artfully insists otherwise, I find the lower courts did not manifestly err in concluding NISCO buys limestone for the purpose of producing steam and electricity or in recognizing ash is merely an **incidental by-product** of NISCO's production process, rather than an intentionally produced end product. Thus, I respectfully dissent and would affirm the holdings of the lower courts.

**05/03/16**

SUPREME COURT OF LOUISIANA

NO. 2015-C-1439

CYNTHIA BRIDGES, SEC., DEPT. OF REV., STATE OF LOUISIANA
VERSUS
NELSON INDUSTRIAL STEAM CO.

CONSOLIDATED WITH

NELSON INDUSTRIAL STEAM CO.
VERSUS
CALCASIEU PARISH SCHOOL SYSTEM SALES AND USE TAX DEPT.,
ET AL.

CONSOLIDATED WITH

CYNTHIA BRIDGES, SEC., DEPT. OF REV., STATE OF LOUISIANA
VERSUS
NELSON INDUSTRIAL STEAM CO.

CONSOLIDATED WITH

NELSON INDUSTRIAL STEAM CO.
VERSUS
CALCASIEU PARISH SCHOOL SYSTEM SALES AND USE TAX DEPT.,
ET AL.

*ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, THIRD CIRCUIT,
PARISH OF CALCASIEU*

**WEIMER, J.**, dissenting in part.

As noted in the majority opinion, this matter came before this court previously following a summary judgment in **Bridges v. Nelson Indus. Steam Co.**, 13-0171 (La. 3/8/13), 108 So.3d 1168. In a per curiam, the summary judgment in favor of the tax collector was reversed, with a finding that "genuine issues of material fact exist," ***Id.***, as to whether the limestone is "*material for further processing*, and as such, [is] purchased with the purpose of inclusion in the end products." See **International**

**Paper, Inc. v. Bridges**, 07-1151, p. 19 (La. 1/16/08), 972 So.2d 1121, 1133-34. On remand, the lower courts found that Nelson Industrial Steam Company (Nelson) buys limestone for the purpose of producing steam and electricity and that its production of ash is merely an "incidental by-product" of Nelson's production process, not an intentionally produced end product. See **Bridges v. Nelson Indus. Steam Co.**, 14-1250, p. 18-21 (La.App. 3 Cir. 6/24/15), 169 So.3d 711, 721-23.

As recognized by the majority, sales tax is levied on the "sale at retail," which is defined in La. R.S. 47:301(10)(a).[1] See La. R.S. 47:302(A). Sale at retail "does not include sale of materials for further processing into articles of tangible personal property for sale at retail." La. R.S. 47:301(10)(c)(i)(aa). "[R]aw materials 'further processed' into end products are excluded[2] from the sales and use tax provisions when: (1) the raw materials become *recognizable* and *identifiable components* of the end products; (2) the raw materials are *beneficial* to the end products; and (3) the raw materials are *material for further processing*, and as such, are purchased with the *purpose of inclusion* in the end products." **Bridges v. Nelson Indus. Steam Co.**, 15-1439, slip op. at 8 (La. 5/___/16) (quoting **International Paper, Inc.**, 07-1151 at 19, 972 So.2d at 1134). The first two prongs are derived from LAC 61:I.4301(C), which the Louisiana Department of Revenue promulgated to provide guidance on the meaning of the "further processing" phrase in La. R.S. 47:301(10)(c)(i)(aa).[3] This administrative regulation clarifies that a raw material "become a **recognizable** and **identifiable component** which is of some **benefit** to the end product." LAC

---

[1] See **Bridges v. Nelson Indus. Steam Co.**, 15-1439, slip op. at 5 (La. 5/___/16).

[2] Notably, the distinction between an exclusion and an exemption (of which the legislature should be aware) has been blurred due to the significance attached the classification, which bears on the burden of proof imposed on the parties to an action.

[3] See **Bridges**, 15-1439, slip op. at 7.

61:I.4301(C), Retail Sale or Sale at Retail (d),(emphasis added). As recognized by the majority, the third prong of this test (that is at issue in this case) finds its origin in **Traigle v. PPG Indus., Inc.**, 332 So.2d 777, 781 (La. 1976), and was reiterated in **Vulcan Foundry, Inc. v. McNamara**, 414 So.2d 1193, 1198-99 (La. 1982) (on reh'g).[4]

Nelson is principally in the business of producing electricity and steam, but also produces and sells ash. It purchased limestone for the primary purpose of reducing the sulfur emissions that resulted from its choice of fuel (petcoke) for the boilers used in its fuel producing process, so as to comply with federal and state regulations. Clearly, limestone was not purchased for the purpose of being incorporated into the end products–electricity and steam. However, since La. R.S. 47:301(10)(c)(i)(aa) and the test advanced by **International Paper** are not limited to a primary purpose[5] or a single purpose,[6] it is conceivable that Nelson's purchase of limestone served a dual purpose, one of which satisfied the requirements of the further processing exclusion. The limestone (absent the calcium carbonate from the limestone that interacted with the sulfur emitted from the petcoke and was consumed during the fuel production process) ultimately formed part of the ash–Nelson's third end product in this case. Significantly and importantly for this analysis, the evidence submitted below established that the ash has several commercial applications and is sold to third parties unrelated to Nelson in legitimate arm's-length transactions. The gross tonnage of the

---

[4] See **Bridges**, 15-1439, slip op. at 7-8.

[5] See **International Paper**, 07-1151 at 21, 972 So.2d at 1135 (in which this court dispelled the idea of a primary purpose test, implying that the purpose may be a secondary or tertiary purpose).

[6] Furthermore, La. R.S. 47:301(10)(c)(i)(aa) does not preclude a byproduct from qualifying as an "article[] of tangible personal property," and the **International Paper** test does not preclude a byproduct from qualifying as an "end product[]." **International Paper**, 07-1151 at 21, 972 So.2d at 1135.

limestone used approximately equaled the gross tonnage of the ash produced. As a result of the limestone's interaction with the sulfur emitted during Nelson's fuel production, ash is produced, even if incidentally. In this context, some portion of the limestone is further processed as required by La. R.S. 47:301(10)(c)(i)(aa).

Nelson's decision to use petcoke, instead of natural gas, as a fuel source in its fuel production process was made with full awareness that Nelson would become a producer of ash. Upon making this decision, Nelson made revisions to its facilities to accommodate the ash that would be produced as a result of its conversion to a more economical circulation fluidized boilers technology. Therefore, the inescapable conclusion is that the limestone was purchased for the purpose of inclusion in the ash. This satisfies the requirement of the third prong of the further processing test advanced by **International Paper**. Without the limestone, there would be no ash. Although the production of ash was not Nelson's primary purpose for purchasing the limestone, I believe, given the record in this case, that the limestone was undoubtedly "purchased [by Nelson] with the *purpose of inclusion* in the end products"–the ash, as required by **International Paper**, 07-1151 at 23, 972 So.2d at 1136. Accordingly, the further processing exclusion of La. R.S. 47:301(10)(c)(i)(aa) applies in this case.

However, the difference in the costs of the limestone and sales price of the ash reveals that most of the limestone's value lies in its calcium carbonate, which is consumed in Nelson's fuel production process to inhibit sulfur emissions and is, thus, not included in the ash.[7] For this reason, I disagree with the majority's approach as

---

[7] As noted by the majority, Nelson buys $46 million worth of limestone, which results in the production of $6.8 million worth of ash. See **Bridges**, 15-1439, slip op. at 11. The majority awards a tax-free pass on the entire $46 million limestone purchase. The fallacy of that award is no business would be in business if it spent $46 million on a raw material to produce an end product that sells for only $6.8 million. The statute does not sanction that absurdity. See La. R.S. 1:4 ("When the wording of a Section is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit."); La. C.C. art. 9 ("When a law is clear and unambiguous and its application does not lead to absurd consequences,

4

I do not believe under the facts of this case that the entire cost of the limestone should be excluded from sales tax under the guise of the further processing exclusion. I believe, like Justice Marcus in **Traigle v. PPG Industries, Inc.**, 332 So.2d 777, 783 (La. 1976) (Marcus, J., dissenting in part), that the better approach in a case such as this, where all of the limestone (after removal of the calcium carbonate during Nelson's fuel production process) goes into the production of an undeniably marketable product, although incidentally, would be to allocate the costs of the limestone based on its use.[8] Accordingly, I believe that sales tax is owed on that portion of the limestone that is not incorporated into the ash. Simply stated, taxes are due on what is consumed (calcium carbonate), not what goes into what is produced (ash).

Such an apportionment would be based on the value of the limestone consumed (the calcium carbonate) and the value of what remains of the limestone for incorporation into the ash. The market value of the ash would be an important factor in determining this apportionment. Such an interpretation of these statutory provisions is in accord with the language of La. R.S. 47:302(A) and La. R.S. 47:301(10), particularly La. R.S. 47:301(10)(c)(i)(aa), which limits the applicability of the exclusion to those materials "further process[ed] into articles of tangible personal property for sale at retail." Furthermore, La. R.S. 47:301(10)(c)(i)(aa) does not indicate that the entire purchase of a raw material must be either taxable or nontaxable. The fact that expert testimony may be needed to determine what portion of the sale of raw material to Nelson constitutes a "sale at retail" as contemplated by La. R.S. 47:301(10)(a) for

---

the law shall be applied as written ....").

[8] This case differs from those in which only a small amount of the material in question appears in the end product. See e.g., **Vulcan Foundry, Inc.**, 414 So.2d at 1199 (on reh'g).

purposes of computing sales and use tax should not preclude the adoption of this statutorily authorized approach.

Failure to adopt a divisible sale approach would allow the purchaser of raw materials to escape the payment of sales tax on that portion of the raw materials consumed in the manufacturing process of which the purchaser/manufacturer is the ultimate consumer. Because the portion of raw material consumed during the manufacturing process forms no part of end products in this case (electricity, steam and ash), the purchasers of those end products would not be the ultimate consumers on which the sales tax burden would lie. This case does not involve an issue of double taxation, rather it involves an issue of tax avoidance as to the portion of the limestone that is consumed by Nelson. The majority opinion provides the taxpayer (Nelson) with a windfall by finding that the entire purchase price of the limestone qualifies for the further processing exclusion despite that the taxpayer (Nelson) is the ultimate consumer of the most valuable component of the limestone. However, the taxpayer (Nelson) should not be taxed on the additional raw material that is used to make an end product for sale at retail that it had the innovation and creativity to produce, market, and sell.

In summary, Nelson is the ultimate consumer of that portion of the limestone that is consumed during the manufacturing process of electricity and steam and thus is responsible for the payment of sales tax on the amount to be consumed in its manufacturing process. As an incidental benefit of the divisible sale approach, businesses would be encouraged to be creative and innovative in their efforts to fashion other revenue sources which benefit the economy and, as in this instance, make a marketable product as opposed to generating disposable waste.

Accordingly, I respectfully dissent in part from the majority opinion.  In all other respects, I agree with the majority opinion.

05/03/16

# SUPREME COURT OF LOUISIANA

## NO. 2015-C-1439

## CYNTHIA BRIDGES, SEC., DEPT. OF REV., STATE OF LOUISIANA VERSUS NELSON INDUSTRIAL STEAM CO.

### CONSOLIDATED WITH

## NELSON INDUSTRIAL STEAM CO. VERSUS CALCASIEU PARISH SCHOOL SYSTEM SALES AND USE TAX DEPT., ET AL.

### CONSOLIDATED WITH

## CYNTHIA BRIDGES, SEC., DEPT. OF REV., STATE OF LOUISIANA VERSUS NELSON INDUSTRIAL STEAM CO.

### CONSOLIDATED WITH

## NELSON INDUSTRIAL STEAM CO. VERSUS CALCASIEU PARISH SCHOOL SYSTEM SALES AND USE TAX DEPT., ET AL.

## ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, THIRD CIRCUIT, PARISH OF CALCASIEU

**HUGHES, J.**, concurs in part and dissents in part for the reasons assigned by Weimer, J.